## Case No. 17,662.

### WILKIE et al. v. TWO HUNDRED AND FIVE BOXES OF SUGAR.

#### [Bee, 82.] 1

District Court, D. South Carolina. July, 1796.

##### DERELICT—PROPERTY FOUND AT SEA—ABANDONMENT.

No length of time shall divest the original owner of property found derelict at sea. It will be restored upon payment of salvage according to circumstances: unless there be proof of an intention to abandon wholly.

[Cited in The John Wurts, Case No. 7,434.]
[Cited in Eads v. Brazelton, 22 Ark. 499.]

BEE, District Judge. The libel is filed against sundry articles claimed as derelict. The vessel out of which they were taken, was found on the high seas, without any living creature on board; and is supposed to be Spanish. A claim is exhibited by the Spanish consul on behalf of the owners or insurers of a Spanish vessel called the St. Petre, belonging to subjects of the king of Spain. It is stated that the said brig, having encountered a violent storm at sea, was so much damaged as to compel the master and crew to abandon her. That they accordingly quitted her, and were received on board of an American vessel belonging to Philadelphia, where they arrived in safety. The claim further states that the said brig afterwards drifted near the shore of North Carolina, and was carried into some port of that state; where the rest of the cargo was safely landed.

In arguing the cause, it was strongly contended for the actors that this vessel had been so completely abandoned at sea as to become the property of the first subsequent finder. It was said that the owner of property might so cast it away as to relinquish his right; and that such was the case here. But, to constitute such a relinquishment, it must be shewn to be voluntary, and not caused by circumstances which the first owner could not control. If a case of this sort ever happened, the present is not like it. There is not a shadow of reason for supposing that this vessel was abandoned voluntarily. When the articles now libelled for were taken out, the vessel was a mere wreck: she had evidently been exposed to some dreadful tempest. If it were proved that she had been long in this condition, it would give no better right than would have accrued to the day subsequent to the abandonment of her. Cases were cited to shew the difference in regulating wreck and derelict, from the times of the Rhodians to the present. The laws of Rhodes did, indeed, give all wrecked property, cast on shore, to the lord of the soil, even though the owners were saved. But the Roman law was directly opposed to this; and the laws of Oleron make a distinction between wrecks where all on board had perished, and those where some living creature had reached land; probably because, in the latter case, the original owner might be discovered. But if this was thought necessary formerly, it can hardly apply to modern times, when the marks of property are so much more numerous and clear. Molloy says that there is as it were a contract between those who are wrecked and those on land where the goods are cast, that the same shall be restored. And Lord Mansfield in the case quoted from 5 Burrows, 2738, asserts that there never was a determination in the courts so contrary to the principles of law, justice, and humanity as the one now contended for. The same may be said of all the old cases from Molloy, Bracton, Briton, Postlethwaite, Domat. and others, respecting derelicts at sea. Why should the owners of property suffer more on one element than on the other? Formerly, indeed, the probability of its being saved at sea was comparatively small, because fewer vessels then navigated the ocean. But at this day, when it is covered with the ships of different nations, the chances of being met with are a thousand-fold greater, and the doctrine no longer should be maintained. Vattel calls it "the unhappy fruit of barbarism, which almost every where disappeared with it." Vatt. Law Nat. 1, 23, 293. The case cited from Beaw. Lex Merc. 147, is in point. The vessel there was abandoned at sea by the master and crew; yet the court of admiralty of Dunkirk gave salvage, and restored the rest. In that case, as in the present, the abandonment was, perhaps, premature. That vessel did not go to pieces; and this brig drifted to the coast of North Carolina: for I have no doubt that she is the same that the Spanish consul describes. This is clear to me from a comparison of the protest of Captain Basset, who carried the crew to Philadelphia, with that of Captain Wilkie, who met with the brig after she was abandoned. The former says that she was a brig, called the San Piero; that she was abandoned on the 4th August: that she appeared to him to be in a most dismal situation, her masts gone, and her rudder almost gone: that it was so broken as to be unfit for use, and incapable of repair; that the vessel leaked much, and that, in his opinion, the crew would have risqued their lives by remaining longer on board. Wilkie says that he met with the vessel on the 19th of August: that she appeared to be either a ship or a brig; that she seemed to have lost her masts, though, when he boarded her, he found her mainmast and bowsprit standing. The head of the rudder down to the water's edge was broken off, and she had four feet water in her hold. In passing her stern he saw some letters, under the cabin windows, nearly effaced; but he supposed them to mean St. Peter. These different names of the same saint might, in so obliterated a state, appear a little differ-

1 [Reported by Hon. Thomas Bee, District Judge.]

ent to these two captains. Some of the exhibits state that the brig San Pedro drifted on the shore of North Carolina some time in the same month of August. She had been derelict fifteen days when Wilkie found her. He towed her till the 22d, and then the hawser broke, and she parted in the night, at such a distance from the spot to which she drifted as might well be passed in the nine remaining days of August.

From a view of all these circumstances, I am satisfied that this is the same vessel, and upon a comparison of this case with that of The Priscilla, decided by me three years ago, I see no reason to vary from the principle established on that occasion. If I am wrong, an appeal to a higher tribunal will put at rest all difference of opinion upon a point of so much importance to the interests of commerce.

I adjudge and decree that the proceeds of the sale of the articles mentioned in the libel, after deducting the usual charges, be divided equally between the actors and the former owners, if they shall duly authenticate their property within twelve months from this day. If not, let one moiety remain deposited in the branch bank of this city to await the further order of the court. As there is a possibility that this may be finally adjudged to persons not subjects of the king of Spain, I dismiss the claim of the Spanish consul; but without costs.