## HARRY STEINBRAKER *v.* LORENZO D. CROUSE.
[No. 46, October Term, 1935.]

*Decided January 15th, 1936.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, SHEHAN, and JOHNSON, JJ.

*Hilary W. Gans* and *Joseph T. Brennan,* with whom were *Brown & Brune* on the brief, for the appellant.

*Joseph A. Wilmer* and *John F. Mudd,* with whom were *Ida Taxin Fox* and *F. DeSales Mudd,* on the brief, for the appellee.

SLOAN, J., delivered the opinion of the Court.

Harry Steinbraker, plaintiff and appellant, on Decem-

ber 22nd, 1934, filed his bill of complaint in the Circuit Court for Charles County, wherein he alleged that, by deed of assignment dated December 3rd, 1934, from the Potomac Realty Company, Limited, a body corporate of the State of Delaware (amended by agreement at the hearing to read "State of California"), recorded in Charles County, he had acquired "all the right, title, and interest of the said the Potomac Realty Company, Ltd., in and to all lead, copper, brass and other metal of whatever nature owned by it, or to which it has title in and around the hundred and sixty-nine (169) vessels, which said vessels were formerly owned by the Western Marine & Salvage Company, the said vessels being located in Mallow's Bay, near Sandy Point, in Charles County, Maryland"; that "a certain Lorenzo D. Crouse (appellee), his agents, servants and employees, disregarding the interests of" the plaintiff "in and to the lead, copper, brass and other materials contained in said vessels, * * * have entered upon and seized said vessels and are at present engaged in shipping and selling such metals to parties unknown to" the plaintiff; and that as a result of "such depredations" the "value and interest" of the plaintiff's "holding in said vessels and metal is being permanently injured." The bill prayed an injunction and an order passed as prayed.

The defendant answered denying that "the said Harry Steinbraker ever acquired any right, title or interest in and to the lead, copper, brass and other materials" mentioned in the bill of complaint, and admitted that "he, his agents, servants and employees, have heretofore entered upon the sunken hulls of certain vessels mentioned in the bill and engaged in the removal, shipment and sale of certain materials salvaged therefrom, but deny that in so doing they committed any trespass, or disregarded any right, title or interest of the plaintiff for the reason that the materials taken by them were a part of the abandoned wreckage of certain ships that had therefore been dismantled, sunk and abandoned by the Western Marine & Salvage Company."

Although the appellee, Lorenzo D. Crouse, was the only person named as defendant, this suit is really directed against numerous residents of Charles County, variously estimated by witnesses at from fifty to seventy-five, who had been engaged in the same business, on the same wreckage, as the defendant.

Testimony was taken in open court and the case submitted on bill, answer, and evidence, and at the conclusion and after an opinion, of which this is virtually an adoption, a decree was passed dissolving the injunction and dismissing the bill, from which the plaintiff appeals.

According to the evidence, the Western Marine & Salvage Company, a Delaware corporation, on June 30th, 1923, bought from one George D. Perry, of the City of San Francisco, Cal., 232 vessels, according to name, which had been the property of the Government of the United States, the purpose of the purchase being to salvage, dismantle, and remove all portions of the vessels which might be marketable and then distroy the remains. One hundred and sixty-nine of the vessels so bought were floated to the Potomac river and anchored in Mallow's Bay, an indenture of the Potomac River, opposite and almost surrounded by a farm known as Sandy Point in Charles County, in navigable, public waters.

By deed dated April 21st, 1924, one Henry Koester conveyed to the Western Marine & Salvage Company the Sandy Point farm containing 566¼ acres. The Western Marine & Salvage Company then began its salvage operations, after installing on the Sandy Point farm such machinery and equipment as was necessary to the operation. The method and scope of the operation was to remove all machinery, boilers, pipes, and engines, and to strip the vessels of all metal easily removable; the vessels were then towed into Mallow's Bay, where they were burned to the water's edge and then pulled as near to the shore as possible and the salvaging of metal continued, until the spring of 1931. The Western Marine & Salvage Company stated in a letter to its attorney, Mr. E. Cortlandt Parker, of Washington, who represented it in its

negotiations with the Potomac Realty Company and Steinbraker, that it had ceased operations in salvaging in May, 1932, but the evidence is that it had ceased operations the year before, and only had watchmen at Sandy Point until the machinery and equipment on the shore was removed by the purchaser, and there is evidence that the public and the residents in the neighborhood began the removal of metal from the burned and sunken hulls without interference while the watchmen were there.

After the hulls were burned, the company continued its salvaging operations until in March, 1931, when, to all appearances, it abandoned the project, leaving a watchman in charge of the personal property on the Sandy Point farm, and he remained there until the summer of 1932. The Western Marine & Salvage Company apparently was a temporary corporation, formed for the purpose of wrecking and salvaging all that it regarded as valuable and marketable of the 232 vessels purchased from the Government through George D. Perry, one of the stockholders.

On the 24th day of July, 1925, the Western Marine & Salvage Company was granted a permit by the War Department of the Government "to ground, burn and beach in Mallow's Bay, Potomac River, about two hundred hulls." The details with respect to burning, removal, and the obstruction to navigation are all set out with such particularity that it would unnecessarily prolong this opinion to recite them. The time limit on this permit was December 31st, 1928. The War Department, on January 3rd, 1931, granted another permit to the same company, wherein it was recited that application had been made "for authority to extend the area in Mallow's Bay, Potomac river, now used for grounding, burning and beaching wooden hulls, two hundred (200) feet channelward." In that permit it was stated, "that if the structures or work herein authorized is not completed on or before the —— day of December 31, 1931, this permit, if not previously revoked or specifically extended, shall cease and be null and void," and it appears from the

evidence that no such permit or extension has since been granted, nor is there any evidence that an extension was since requested, and the evidence is that none was granted to any one since December 31st, 1931.

The Western Marine & Salvage Company, by deed dated November 30th, 1932, conveyed the Sandy Point farm to the Potomac Realty Company, Limited, a corporation of the State of California, without including or mentioning the remains of the burned and sunken hulls. In the month of December, 1932, the Western Marine & Salvage Company was dissolved, as stated in the letter of the Potomac Realty Company, Limited, to Mr. Parker, of December 22nd, 1934, "chiefly for the reason that at that time, under conditions then prevailing, and due to heavy overhead for maintaining the office and a large force of men, it was deemed too expensive to continue salvaging operations, and for the further reason that the stockholders of said salvage company at that time desired its dissolution in order that they might ascertain what loss had actually been sustained by them as stockholders in that company. The stockholders did not at that time contemplate, nor have they at any time since then contemplated, abandoning these vessels, but as there were only three principals interested in this project, who have been for many years and still are closely associated, they felt that if conditions again warranted any further salvaging they could do so in the nature of a joint venture without the formality of a corporate existence." In spite of the statement contained in this letter that they had not abandoned the burned wreckage, or contemplated returning, we find in the record sufficent evidence to justify the chancellor's conclusion that the burned and sunken hulls had been abandoned, and that this intention to not abandon was an after-thought, more than two years afterward, inspired by the plaintiff, a junk dealer, who had had dealings with the defendant and others so engaged and who saw the possibilities of a more favorable market.

The rule of law with respect to abandoned property is

very simple. Property is abandoned when the owner walks off and leaves it with no intention to again claim it or exercise rights of ownership over it; and when this is done, it belongs to anyone who takes possession of it. With respect to real estate, it is not quite so simple, as the one entering must serve his time of prescription and possession before he can acquire a legal title. In the case of the abandonment of an easement, and this is the kind of most frequent occurrence, abandonment means reversion to the then owner of the fee. It is said in *Brantly on Personal Property*, sec. 133, that "he who takes possession, *animo dominandi*, of a thing which has been abandoned by the owner, immediately becomes the proprietor of it by occupancy. A thing is abandoned when the owner throws it away, or leaves it without custody because he no longer wishes to account it as his property; whence it follows that he ceases at once to be the owner. Both the intent to abandon and the fact of abandonment are necessary. Whether property has been abandoned depends upon the intention of the party, the length of time during which the owner has been out of possession being only important as showing this intention." 1 *R.C.L.* 4; 1 *C.J.* p. 9. The rule in this state with respect to the abandonment of an easement is the same in principle as that just stated by Mr. Brantly concerning personal property. It was said by this court in *Vogler v. Geiss*, 51 Md. 407, 410, in an opinion by Judge Alvey: "It is now very well settled, by authorities of the highest character, that a party entitled to a right of way or other mere easement in the land of another may abandon and extinguish such right by acts *in pais*, and without deed or other writing. The act or acts relied on, however, to effect such result, must be of a decisive character; and while a mere declaration of an intention to abandon will not alone be sufficient, the question, whether the act of the party entitled to the easement amounts to an abandonment or not, depends upon the intention with which it was done, and that is a subject for the consideration of the jury. A cesser of the use, coupled with any act clearly indicative

of an intention to abandon the right, would have the same effect as an express release of the easement, without any reference whatever to time." *Stewart v. May,* 119 Md. 10, 19, 85 A. 957; *Canton Co. v. Balto. & O. R. Co.,* 99 Md. 202, 218, 57 A. 637; *Russell v. Zimmerman,* 121 Md. 328, 334, 88 A. 337; *Grief v. Teas,* 156 Md. 284, 300, 144 A. 231.

So far as this record shows, the Western Marine & Salvage Company was a temporary corporation, formed for the purpose of wrecking and salvaging all that it regarded as valuable, marketable, and profitable of the 232 vessels purchased from and discarded by the Government of the United States. These wrecked hulls were not located on the property of the Western Marine & Salvage Company; they were in navigable waters, occupied by permission of the War Department, which expressly stated that the permit was subject to any other rights of the State or its citizens, public or personal. The vessels were located on land belonging to the State, to which the Federal Government disclaimed any intention of asserting title. The interest of that Government extends only to control of the water over the land, not to the soil. 45 *C.J.* 538, 540; *Sollers v. Sollers,* 77 Md. 148, 151, 26 A. 188. So long as it was engaged in the wrecking and junk business, it secured such permit. When the Western Company was through, in December, 1932, it was dissolved, after it had conveyed its land to the Potomac Realty Company, Limited, and sold its equipment, not to the Potomac Realty Company, the personnel of which was the same as the Western Marine & Salvage Company, but to the Boston Iron & Metal Company, which had no connection with the other companies. When the equipment was so sold, the Western Company was out of business so far as the salvage of these vessels was concerned. It was then, when, to all appearances, the wrecking business of the Western Company was at an end, that the people living in the neighborhood took this view of what they there saw and began to gather the junk remaining in the burned, submerged hulks, and sold it to junk dealers in and around Washington.

One of those so engaged was J. W. Cox, who lived in the neighborhood and who said, as stated in the record, he "was engaged in this work on his own initiative and was not employed by any one to do it. He considered this was abandoned property because it had been lying in the water, some of it, for four or five years. He is no lawyer, but he had always heard that when a ship or anything of that kind was down and the tide rising and falling over it for a number of years it was abandoned property." He said there had not been a watchman there for two years. No one attempted to interfere with his work. Altogether, he said, there were about seventy-five people working there. Another witness who had been removing scrap metal from the vessels was James L. David, who went to the War Department to inquire whether any one had a permit to remove metal from the vessels. "I went to several different members, but they told me there didn't anybody want the thing. * * * Then I went back and went to work," removing and selling scrap from the sunken hulls. He said he had nothing else to do at that time and realized wages from his operations. He was "positive there were as many as fifty" working around there. On cross-examination he said his "reason for going there was because he understood it did not belong to anybody; everybody all over the community, from Washington and other places were going there and helping themselves and they explained that it did not belong to anybody and that it was free for anybody to partake of."

Preston Dent testified that he "went there and began to salvage without any authority from any one, just because he heard that it was open and nobody had anything to do with it; that the salvage company had given it up and it had no more value to it. He had seen Mr. Steinbraker down there while witness was there but had no dealings with him. * * * Most of the wreckage is beneath the water but some parts are sticking above the surface. The wreckage is surrounded by water." He testified that he had gone there in June, 1932, worked a

short time and came back in August, 1934. In the interim
the price of scrap was so low "it was barely worth get-
ting." He owned a barge with which he made two trips
to Washington with loads of seventy and eighty-five tons,
which he sold for six dollars a ton.

Lorenzo D. Crouse, the defendant, had worked for the
Western Marine & Salvage Company, which ceased opera-
tions in March, 1931. He "hooked on the last mast that
was lying alongside the crane." After that the company
kept a watchman until August, 1932, who "told me him-
self that he was placed there to keep anybody from re-
moving any of the equipment that was on the beach."
He understood from the workmen of the company that
the ships were abandoned and "that they were quitting."
He began the removal of lead, brass, copper, and scrap
iron in September, 1932, and continued until the plain-
tiff, Steinbraker, undertook to buy the submerged hulls
and had him enjoined. Most of his sales were to one
Sinclair, in shipments up to thirty tons. For the last
sale to Sinclair, he was paid by the plaintiff, who, accord-
ing to this record, was the ultimate purchaser of much
of the metal sold by the local men to Sinclair, and some
dealt with the plaintiff directly. There was much other
evidence to the same effect, from which it may be in-
ferred that for over two years the wreckage had been
abandoned so far as the community affected did or could
know, and with this impression, under very great diffi-
culties, anywhere from fifty to seventy-five persons had
removed hundreds of tons of metal from these hulls, and
their principal customer was either Sinclair or Stein-
braker, or both, and all without interruption or inter-
ference from the Western Marine & Salvage Company
or any one interested in it, until Steinbraker, with the
price of scrap metal rising, saw the possibilities in these
burned, gutted, submerged vessels, and late in fall of
1934 he "called the Potomac Realty Company on the West
Coast on the phone." This call resulted in the stock-
holders of the Western Marine & Salvage Company, by
agreement dated December 1st, 1934, assigning, releas-

ing, and quitclaiming unto the Potomac Realty Company, Limited, all the "right, title or interest which they or any of them may have in and to all lead, copper, brass and/or other metals of whatsoever kind and nature located in or around each of the 169 vessels or hulls * * * situate in Mallow's Bay, near Sandy Point, Maryland." And by agreement of December 3rd, 1934, the Potomac Realty Company, Limited (of San Francisco, Cal.), assigned the same metals to the plaintiff, Harry Steinbraker, "as is, where is, if is, without any warranty of title whatsoever or otherwise." The price to be paid was two dollars per ton f. o. b. railroad cars, with a deposit of $500 to be applied on the last payments due the purchaser. A bond of $10,000 was required to guarantee non-interference with navigation.

In *Russell v. Stratton*, 201 Pa. 277, 278, 50 A. 975, it is said that abandonment is to be determined from a consideration of the property and the conduct of the plaintiff (in this case owner) in relation to it. *Fidelity-Phila. Trust Co. v. Lehigh Valley Coal Co.*, 294 Pa. 47, 143 A. 474, 479. What was said in the last-mentioned case (294 Pa. 47, 143 A. 474, 480), of an abandoned anthracite culm bank, which afterwards became valuable, in which the evidence almost duplicates the evidence here, applies to this case, and that is: "Inherent to possession is the right to exclusion; and, if through a duration of many years no act or attempted act of exclusion is exercised by a presumed possessor, and through all that time the thing, such as the culm bank here in question, is openly, freely, and continuously depleted, taken, and carried away in vast quantities, without compensation or permission asked, the intention, if it ever existed, to exclude others, has disappeared; and, when there never was, before and after these open appropriations, assertion of title or acts of dominion exercised, the conclusion is inevitable that the legal possession has been relinquished and the thing abandoned."

It requires no stretch of the imagination to believe from the evidence in this record that, if the plaintiff had

not fastened his eyes on these hulls, the so-called "depredations" of the defendant and others in the vicinity of Mallow's Bay would have continued uninterruptedly to this day. The sequence of events from the time the stockholders of the Western Marine & Salvage Company conveyed the land from themselves to themselves under the name of the Potomac Realty Company, Limited, the sale of the equipment to outsiders, the invasion for over two years of the wrecked and sunken vessels, and the continuous, uninterrupted, and open carrying away of the scrap therein, without compensation or permission asked, shows clearly, in our opinion, an intention to abandon and an actual abandonment, not to be recalled by the subsequent negotiations and agreement between the former owners and the plaintiff, and the decree of the chancellor should be affirmed.

*Decree affirmed, with costs.*