**COLUMBUS–AMERICA DISCOVERY GROUP, Plaintiff–Appellee,**

and

**Trustees of Columbia University in the City of New York; Harry G. John; Jack F. Grimm, Plaintiffs,**

v.

**ATLANTIC MUTUAL INSURANCE COMPANY; Insurance Company of North America; Salvage Association; London Assurance; Alliance Assurance Company, Ltd.; Royal Exchange Assurance; Indemnity Marine Assurance Company, Ltd.; Marine Insurance Company, Ltd.; Superintendent of Insurance of the State of New York, Claimants–Appellants,**

and

**The Unidentified Wrecked and Abandoned Sailing Vessel, its engines, tackle, apparel, appurtenances, cargo, etc., located within a box defined by the following coordinates: Northern Boundary—31 degrees 37 minutes North Latitude; Southern Boundary—31 degrees 33 minutes North Latitude; Western Boundary—77 degrees 2 minutes West Longitude; Eastern Boundary—76 degrees 57 minutes West Longitude, (believed to be the S.S. Central America), in rem, Defendant,**

**CIGNA Group, Commercial Union Assurance Company, Ltd.; Commercial Union Insurance Company; William H. McGee & Company, Incorporated; Royal Insurance; Royal Insurance Company, Ltd.; Royal Insurance Company of America; Chubb & Son, Incorporated; Sun Alliance Group; Underwriters at Lloyd's; GRE of America Corporation; Guardian Royal Exchange; Indemnity Mutual Marine Assurance Company; Sun Insurance Company of New York; Sun Insurance Office, Ltd.; Great Western Insurance Company; Sun Mutual Insurance Company; Union Mutual Insurance Company; Oriental Mutual Insurance Company; Commercial Mutual Insurance Company; Mercantile Mutual Insurance Company; New York Mutual Insurance Company; Pacific Mutual Insurance Company; Indemnity Marine; London Associated Corporation; Royal Associated Corporation; Royal Marine; Indemnity Mutual; Royal Exchange & London Offices; Union Bank of London; Commonwealth Fire Insurance Company; Dennis Standefer; the R/V Liberty Star, her master, officers, crew and all persons aboard; Board of Trustees of Columbia University; La-**

---

mont–Doherty Geological Institute; S.S. George Law Partnership; Boston Salvage Consultants, Inc., Claimants.

American Institute of Marine Underwriters; the Board of Underwriters of New York, Amici Curiae.

Harry G. JOHN; Jack F. Grimm, Plaintiffs–Appellants,

Columbus–America Discovery Group, Plaintiff–Appellee,

and

Trustees of Columbia University in the City of New York, Plaintiff,

v.

ATLANTIC MUTUAL INSURANCE COMPANY; Insurance Company of North America; Salvage Association; London Assurance; Alliance Assurance Company, Ltd.; Royal Exchange Assurance; Indemnity Marine Assurance Company, Ltd.; Marine Insurance Company, Ltd.; Superintendent of Insurance of the State of New York, CIGNA Group, Commercial Union Assurance Company, Ltd.; Commercial Union Insurance Company; William H. McGee & Company, Incorporated; Royal Insurance; Royal Insurance Company, Ltd.; Royal Insurance Company of America; Chubb & Son, Incorporated; Sun Alliance Group; Underwriters at Lloyd's; GRE of America Corporation; Guardian Royal Exchange; Indemnity Mutual Marine Assurance Company; Sun Insurance Company of New York; Sun Insurance Office, Ltd.; Great Western Insurance Company; Sun Mutual Insurance Company; Union Mutual Insurance Company; Oriental Mutual Insurance Company; Commercial Mutual Insurance Company; Mercantile Mutual Insurance Company; New York Mutual Insurance Company; Pacific Mutual Insurance Company; Indemnity Marine; London Associated Corporation; Royal Associated Corporation; Royal Marine;

Indemnity Mutual; Royal Exchange & London Offices; Union Bank of London; Commonwealth Fire Insurance Company; Dennis Standefer; the R/V Liberty Star, her master, officers, crew and all persons aboard; Board of Trustees of Columbia University; Lamont–Doherty Geological Institute; S.S. George Law Partnership; Boston Salvage Consultants, Inc., Claimants,

v.

The UNIDENTIFIED WRECKED AND ABANDONED SAILING VESSEL, its engines, tackle, apparel, appurtenances, cargo, etc., located within a box defined by the following coordinates: Northern Boundary—31 degrees 37 minutes North Latitude; Southern Boundary—31 degrees 33 minutes North Latitude; Western Boundary—77 degrees 2 minutes West Longitude; Eastern Boundary—76 degrees 57 minutes West Longitude, (believed to be the S.S. Central America), in rem, Defendant.

American Institute of Marine Underwriters; the Board of Underwriters of New York, Amici Curiae.

TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, Plaintiff–Appellant,

Columbus–America Discovery Group, Plaintiff–Appellee,

and

Harry G. John; Jack F. Grimm, Plaintiffs,

Atlantic Mutual Insurance Company; Insurance Company of North America; Salvage Association; London Assurance; Alliance Assurance Company, Ltd.; Royal Exchange Assurance; Indemnity Marine Assurance Company, Ltd.; Marine Insurance Company, Ltd.; Superintendent of Insurance of the State of New York; CIGNA Group, Commercial Union Assurance Company, Ltd.; Commercial Union Insurance Company; William H. McGee & Company, Incorporated; Royal Insurance; Royal Insurance Company, Ltd.; Royal Insurance Company of America; Chubb & Son, Incorporated; Sun Alli-

ance Group; Underwriters at Lloyd's; GRE of America Corporation; Guardian Royal Exchange; Indemnity Mutual Marine Assurance Company; Sun Insurance Company of New York; Sun Insurance Office, Ltd.; Great Western Insurance Company; Sun Mutual Insurance Company; Union Mutual Insurance Company; Oriental Mutual Insurance Company; Commercial Mutual Insurance Company; Mercantile Mutual Insurance Company; New York Mutual Insurance Company; Pacific Mutual Insurance Company; Indemnity Marine; London Associated Corporation; Royal Associated Corporation; Royal Marine; Indemnity Mutual; Royal Exchange & London Offices; Union Bank of London; Commonwealth Fire Insurance Company; Dennis Standefer; the R/V Liberty Star, her master, officers, crew and all persons aboard; Board of Trustees of Columbia University; Lamont–Doherty Geological Institute; S.S. George Law Partnership; Boston Salvage Consultants, Inc., Claimants,

v.

The UNIDENTIFIED WRECKED AND ABANDONED SAILING VESSEL, its engines, tackle, apparel, appurtenances, cargo, etc., located within a box defined by the following coordinates: Northern Boundary—31 degrees 37 minutes North Latitude; Southern Boundary—31 degrees 33 minutes North Latitude; Western Boundary—77 degrees 2 minutes West Longitude; Eastern Boundary—76 degrees 57 minutes West Longitude, (believed to be the S.S. Central America), in rem, Defendant.

American Institute of Marine Underwriters; the Board of Underwriters of New York, Amici Curiae.

Nos. 90–2730 to 90–2732.

United States Court of Appeals, Fourth Circuit.

Argued June 5, 1991.

Decided Aug. 26, 1992.

As Amended Nov. 12, 1992.

Douglas A. Jacobsen, Bigham, Englar, Jones & Houston, John H. Reilly, Jr., Dickerson & Reilly, Edward A. Friedman, Friedman & Kaplan, New York City, Guilford D. Ware, Crenshaw, Ware & Martin, Norfolk, Va., argued (Marilyn L. Lytle, George R. Daly, Bigham, Englar, Jones & Houston, Robert D. Kaplan, Friedman & Kaplan, New York City, James L. Chapman, IV, Crenshaw, Ware & Martin, Norfolk, Va., Daniel R. Warman, John Y. Richardson, Jr., Williams, Worrell, Kelly, Greer & Frank, Norfolk, Va., on brief), for appellants.

Richard T. Robol, Hunton & Williams, Norfolk, Va., Robert W. Trafford, Porter, Wright, Morris & Arthur, Columbus, Ohio, argued (Kevin J. Cosgrove, Robert M. Tata, Stephen W. Haynie, Hunton & Williams, Norfolk, Va., Curtis A. Loveland, William J. Kelly, Jr., Daniel F. Gourash, Porter, Wright, Morris & Arthur, Columbus, Ohio, on brief), for appellee.

Allan S. Reynolds, Reynolds, Smith & Winters, Norfolk, Va., for amici curiae.

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

## OPINION

DONALD RUSSELL, Circuit Judge:

"When Erasmus mused that '[a] common shipwreck is a source of consolation to all', *Adagia*, IV.iii.9 (1508), he quite likely did not foresee inconcinnate free-for-alls among self-styled salvors." *Martha's Vineyard Scuba HQ, Inc. v. The Unidentified, Wrecked and Abandoned Steam Vessel*, 833 F.2d 1059, 1061 (1st Cir.1987). Without doubt the Dutch scholar also could not imagine legal brawls involving self-styled "finders" from Ohio, British and American insurance underwriters, an heir to the Miller Brewing fortune, a Texas oil millionaire, an Ivy League university, and an Order of Catholic monks. Yet that is what this case involves, with the prize being up to one billion dollars in gold.

This gold was deposited on the ocean floor, 8,000 feet below the surface and 160 miles off the South Carolina coast, when the S.S. CENTRAL AMERICA sank in a hurricane on September 12, 1857. The precise whereabouts of the wreck remained unknown until 1988, when it was located by the Columbus–America Discovery Group ("Columbus–America"). This enterprise has since been recovering the gold, and last year it moved in federal district court to have itself declared the owner of the treasure. Into court to oppose this manoeuvre came British and American insurers who had originally underwritten the gold for its ocean voyage and then had to pay off over a million dollars in claims upon the disaster. Also attempting to get into the stew were three would-be intervenors who claimed that Columbus–America had used their computerized "treasure map" to locate the gold. The district court allowed the intervention, but it did not give the intervenors any time for discovery.

After a ten-day trial, the lower Court awarded Columbus–America the golden treasure in its entirety, 742 F.Supp. 1327. It found that the underwriters had previously abandoned their ownership interests in the gold by deliberately destroying certain documentation. As for the intervenors, the Court held that there was no evidence showing that Columbus–America used their information in any way in locating the wreck.

Upon appeal, we find that the evidence was not sufficient to show that the underwriters affirmatively abandoned their interests in the gold. We also hold that once intervention was allowed, the district court abused its discretion by not affording the intervenors sufficient time for discovery. We therefore reverse the decision below and remand the case for further proceedings.

## I.

### A.

The year 1857 is justly famous in American history for its many notable events. Among these was the beginning of a fairly serious financial decline, the aptly named Panic of 1857. Associated with the Panic, and another reason why the year is so famous, is one of the worst disasters in American maritime history, the sinking of the S.S. CENTRAL AMERICA.

The CENTRAL AMERICA was a black-hulled, coal-fired, three-decked, three-masted sidewheeler with a cruising speed of eleven knots. Built in 1852, and launched the following year, she carried passengers, mail, and cargo between Aspinwall, Colombia (on the Caribbean side of the isthmus of Panama), and New York City, with a stopover in Havana. Most, if not all, of her passengers were headed to or from California, the route being one leg of the then quickest way between the west coast and the eastern seaboard—from California to the Pacific side of the isthmus of Panama aboard a steamship, across the isthmus on the Panama Railroad, and then from Aspinwall to New York aboard another steamship. Owned by the U.S. Mail and Steamship Company and originally named the S.S. GEORGE LAW (until June 1857), the CENTRAL AMERICA completed forty-three voyages between Panama and New York in her four years of operation. During this period, the California gold rush was in full swing, and it has been said that the ship carried one-third of all gold shipped at that time from California to New York.

In August of 1857, over four hundred passengers and approximately $1,600,000 (1857 value) in gold (exclusive of passenger gold) left San Francisco for Panama aboard the S.S. SONORA. Many of the passengers were prospectors who had become rich and were returning home, either for good or to visit. Also on board were California Judge Alonzo Castle Monson, who resigned from the bench after losing his house and all his money in a famous poker game, and Mrs. Virginia Birch, a.k.a. "the notorious Jenny French," a former dance hall girl well known in San Francisco. As for the gold, it was being shipped by California merchants, bankers, and express companies, including Levi Straus and Wells Fargo, to New York banks, the banks

wanting specie to stave off the effects of the financial downturn.

The travellers and the cargo reached Panama without incident, and they crossed the isthmus by rail. On September 3, over six hundred people came aboard the CENTRAL AMERICA, as well as $1,219,189 of the gold shipped on the SONORA, the remainder being shipped to England aboard a different vessel. The CENTRAL AMERICA first headed for Havana, which was reached on September 7. There, the ship lay over for a night, and some of the passengers debarked to catch another vessel for New Orleans. On September 8, under clear skies, the CENTRAL AMERICA left Havana for New York, carrying approximately 580 persons and her golden treasure.

On the second day out of Havana, the weather changed and a mighty storm came up. What the passengers and crew could not know was that they were headed directly into the teeth of a ferocious hurricane. As the storm worsened around the CENTRAL AMERICA, a leak developed and soon water was rushing into the boat. The water extinguished the fires in the ship's boilers, and this in turn caused the ship's pumping system to fail. All able male passengers began a systematic bailing of water out of the ship, but it was to no avail; after thirty frantic hours, the boiler fires would still not light and the water level continued to rise.

Knowing the situation was hopeless, Captain William Lewis Herndon managed to hail a passing ship, the brig MARINE, and one hundred persons, including all but one of the women and children aboard, were safely transferred to the other ship. Time and conditions would not allow for any more transfers, however, and shortly after 8 p.m. on September 12, the CENTRAL AMERICA began making its quick descent to the bottom of the ocean.

After being flung into the sea, many of the men managed to come to the top and float there, desperately holding onto any buoyant material available. Six to nine hours after the sinking, fifty of these men were rescued by the Norwegian bark EL-LEN. Earlier, a small bird had thrice circled the ELLEN and flown directly into the face of the ship's captain. Taking this as a sign, the captain changed his course to follow from whence the bird had come, and in so doing discovered the fifty floating survivors. Three other men were also rescued when, nine days later and 450 miles away, a ship spotted their lifeboat, which had been riding the Gulf Stream.

In all, 153 persons were rescued, while approximately 425 lost their lives. Also lost were hundreds of bags of mail and the $1,219,189 in gold. At the time, there were rumors that other commercial shipments of gold were aboard, but these were quickly discounted. It is true, though, that a significant amount, probably several hundred thousand dollars worth (1857 valuation), of passenger gold was lost. Many passengers had with them their earnings from several years' labor in the California gold fields. Some kept this gold on their person, while others carried it in carpetbags or trunks. Also, passenger gold could have been checked with the ship's purser, although these records were lost with the ship. Captain Thomas W. Badger is one example of a passenger carrying gold, he having lost $17,500 of it stored in a carpetbag. Also, the newspapers reporting the disaster contained vivid accounts of men flinging down their hard earned treasure in disgust upon realizing their impending doom.

Needless to say, for the next several weeks newspapers around the country devoted much space to the disaster which befell the CENTRAL AMERICA. While people mourned the over four hundred persons who had valiantly lost their lives, they also feared that the loss of such a large amount of specie would exacerbate the country's already serious financial situation. The commercial shipments of gold had been insured, though, and the insurance underwriters began advertising in the newspapers that they would pay off their commitments upon the proper proofs being presented. Approximately one-third of the treasure had been underwritten by New York insurers while the rest was underwritten in London. Without doubt, most, if

not all, of the claims were promptly paid off by the underwriters.

Under applicable law, then and now, once the underwriters paid the claims made upon them by the owners of the gold, the treasure became theirs. Thus, less than two weeks after the disaster, the underwriters began negotiating with the Boston Submarine Armor Company about possibly raising the ship and her cargo. Also, on June 28, 1858, two of the underwriters (Atlantic Mutual Insurance Company and Sun Mutual Insurance Company) contracted with Brutus de Villeroi, a Frenchman then living in Pennsylvania, to salvage the gold. The contract states that de Villeroi, "by means of his Invention of a Submarine boat" and at his own expense, would raise the treasure and receive a salvage award of seventy-five percent. At this time, though, no one was quite sure where the boat had gone down, or in how deep of water. At first, some estimated the ship was in only twenty-eight fathoms of water (168 feet), when in fact it was over 8,000 feet below the surface. As would be expected, nothing came of the salvage attempts in the late 1850s, and the issue, and the gold, would lie dormant for over a hundred and twenty years.

### B.

Beginning in the 1970s, a number of individuals and groups began discussing and planning the salvage of the CENTRAL AMERICA, as the decade before had seen a great advance in the technology necessary for deep sea salvage. Still, though, no one was positive where the ship had gone down or in what depth of water. At least one group thought they had found her in shallow water fifteen miles off Cape Hatteras, which in reality was at least one hundred miles from where she actually lay.

A number of those interested in salvaging the CENTRAL AMERICA contacted some of the various insurers who had underwritten the gold. The would-be salvors hoped to receive a relinquishment of the insurers' rights to the property, or at least form a salvage contract with the underwriters. While the underwriters negotiated with several groups about the salvage, they did not enter into any salvage contracts nor did they relinquish any of their rights to the gold.

One of the groups that contacted several of the underwriters was Plaintiff Columbus–America Discovery Group, the eventual salvor. Columbus–America asked the underwriters to convey to it any claims they might have regarding the gold, but this was not done.

Another group that was interested in salvaging the gold was Santa Fe Communications, Inc. ("Santa Fe"), whose interests are now owned by Plaintiff–Intervenors Harry G. John and Jack R. Grimm.[1] In 1984, Santa Fe paid Plaintiff–Intervenor Columbia University $300,000 for Columbia's Dr. William B.F. Ryan to conduct a sonar search over a 400 square mile area of the Atlantic Ocean. During his sonar search, Dr. Ryan identified seven "targets" on the ocean floor. Of these targets, he found only one, target #·4, to be a good candidate for being the CENTRAL AMERICA. Dr. Ryan felt that "this target is almost certainly the scattered debris of a shipwreck," and his report mentioned that further exploration of it would have been made but for "gale force winds and seas." In conclusion, he told Santa Fe, "you [Harry John] and Mr. Jack Grimm have a likely candidate for further exploration." Santa Fe, though, did not further pursue the matter, and on December 31, 1984, it transferred to a Catholic monastic order, the Province of St. Joseph of the Capuchin Order— St. Benedict Friary of Milwaukee, Wisconsin ("the Capuchins"), any and all rights and interests arising out of its undersea salvage operations. It now appears that target #4 was indeed the CENTRAL AMERICA.

The contract between Santa Fe and Columbia provided that Columbia would be able to freely publish the results of the

---

1. John is an heir to the Miller Brewing Company, while Grimm is a multi-millionaire Texas oilman who has in the past led searches for Noah's Ark, the Loch Ness Monster, and the TITANIC.

sonar survey, but only after keeping such results confidential for a year. Shortly after the survey, Columbus–America President Thomas Thompson began contacting Dr. Ryan and others at Columbia and Santa Fe in an attempt to learn the results. Over a two-year period, Thompson and Dr. Ryan had a number of conversations about the techniques for identifying sonar images on the ocean floor, but the latter only believed that Thompson, who was associated with the prestigious Battelle Memorial Institute, was interested in this information from a scientific standpoint.

On February 12, 1986, Thompson wrote Dr. Ryan and requested certain sonar photographs taken during the survey. The letter also stated, "I am submitting this order primarily out of personal interest. I have a personal source of funds available for data collection and correlation-type work. I am also interested in the techniques for separating anomalies from their environment and in the processing of specific anomalies to determine their character." Dr. Ryan passed along Thompson's request to Columbia, which agreed to provide the information. As a condition, though, Columbia told Thompson that "since the data you requested is not in the public domain, we would require your agreement that any photo-copied records or computer tapes you receive would be for your sole use and would not be reproduced for others." Thompson agreed to this condition, but went ahead and placed the information he received into Columbus–America's files.

### C.

In 1987, after much effort and expense, Columbus–America believed it had found the CENTRAL AMERICA. Thus, on May 27, 1987, it filed, in the United States District Court for the Eastern District of Virginia, an *in rem* action against the wreck, alleging that, under the law of finds, it was its "finder," or, alternatively, under the law of salvage, its "salvor." Columbus–America then asked for and received, on July 17, 1987, a preliminary injunction enjoining the other would-be salvors from

operating within a specified area ("injunction box # 1") of the sea. Injunction box # 1 covered an area which was approximately thirty miles from Dr. Ryan's target # 4.

After receiving this injunction, Columbus–America spent two years attempting to salvage the wreck they thought was the CENTRAL AMERICA—this time was also spent battling the other would-be salvors in court. Plaintiffs recovered several artifacts, as well as a good many lumps of coal, but at some point they recognized that they were salvaging the wrong ship. They then began to look at other likely targets, and, eventually, they discovered the right ship. Thus, Columbus–America requested the Court to grant them, by permanent injunction, exclusive control over the area around this new find, and this was done through an Order entered on August 18, 1989 ("injunction box # 2"). Within the area of injunction box # 2 was Dr. Ryan's target # 4.

Since 1989, Columbus–America, through its invention of a submersible robot which can pick up objects ranging from small gold coins to a ship's anchor weighing thousands of pounds, has been salvaging objects left on the ocean floor by the CENTRAL AMERICA. Undoubtedly, its major interest is in recovering the gold, and so far several hundred million dollars worth (present value) of gold coins, ingots, and bars have been recovered—it is estimated that the total haul may be worth up to one billion dollars.

On September 29, 1989, many of the original underwriters of the gold, plus the Superintendent of Insurance of the State of New York for several insurance companies now defunct, filed claims with the district court asserting that they were the proper owners of the gold. After this, extensive discovery was had, and the case was scheduled for trial beginning April 3, 1990.

Three days before trial, John and Grimm moved to intervene, as did Columbia two days later. The intervenors claimed that Columbus–America must have used the information from Dr. Ryan's sonar survey in locating the CENTRAL AMERICA, and

thus they wished for a percentage of the recovery. Two weeks earlier, John had bought back for $10 any claims the Capuchins would have on the CENTRAL AMERICA. When Santa Fe had originally donated their rights to the monks in 1984, the Capuchins recognized the gift as worthless, and John did nothing to enlighten them on the discovery of the ship or the upcoming trial. After later realizing what John was up to, though, the monks must have protested, for on April 10 both John and Grimm signed an agreement with the Capuchins giving the Order one-third of any judgment they (John or Grimm) would recover.

The district court allowed John, Grimm, and Columbia to intervene, but it permitted them no discovery—the Court wanting the trial to begin as scheduled. Earlier, the Court had bifurcated the trial, so that the first part would concern only whether Columbus–America was entitled to finder or salvor status. If the district court found that the insurance companies had somehow abandoned the gold, Columbus–America would be considered its "finder," and thus its owner. On the other hand, if the underwriters had not abandoned the gold, they would still remain its owners and Columbus–America would be its "salvor." If the latter scenario were found to be true, a second phase of the trial would be necessary, wherein the Court would have to determine what each underwriter had insured and the amount of Columbus–America's salvage award. Because the trial had been bifurcated, the intervenors wanted their claims adjudicated after the finder/salvor issue was decided. The Court, though, would allow intervention only if the would-be intervenors agreed to have their claims adjudicated at the same time as the finder/salvor issue—that is, beginning the next day.

The trial began on schedule, lasted ten days, and received much national attention. Over its course, many witnesses appeared and hundreds of exhibits were entered into evidence. The parties then began an anxious wait for a decision.

On August 14, 1990, the Court found for Columbus–America on all the issues, dismissing the claims of the underwriters, Columbia, John, and Grimm. *Columbus–America Discovery Group v. The Unidentified, Wrecked and Abandoned Sailing Vessel,* 742 F.Supp. 1327 (E.D.Va.1990). On the finder/salvor issue, the district court held that the underwriters had abandoned the gold, and thus Columbus–America was its finder and sole owner. The Court based this finding of abandonment primarily on the supposed fact that the underwriters had *intentionally* destroyed any documentation they had once had concerning the case. *Id.* at 1344–48. As for the intervenors, the Court found that they failed to prove that the information furnished Thompson could have assisted in locating the ship, that Columbus–America used this information in any way, or "even if the information was of value and was used, that any such use would entitle them to share in any recovery." *Id.* at 1341.

The underwriters and the intervenors now appeal.

## II.

### A.

■ Historically, courts have applied the maritime law of salvage when ships or their cargo have been recovered from the bottom of the sea by those other than their owners. Under this law, the original owners still retain their ownership interests in such property, although the salvors are entitled to a very liberal salvage award. Such awards often exceed the value of the services rendered, and if no owner should come forward to claim the property, the salvor is normally awarded its total value. On salvage generally, see 3A M. Norris, *Benedict on Admiralty: The Law of Salvage* (7th ed. rev. 1991).

■ A related legal doctrine is the common law of finds, which expresses "the ancient and honorable principle of 'finders, keepers.'" *Martha's Vineyard,* 833 F.2d at 1065. Traditionally, the law of finds was applied only to maritime property which had never been owned by anybody,

such as ambergris, whales, and fish. 3A *Benedict on Admiralty* § 158, at 11–15. A relatively recent trend in the law, though, has seen the law of finds applied to long lost and abandoned shipwrecks. *Id.* § 158, at 11–16 to 11–18.

■ Courts in admiralty favor applying salvage law rather than the law of finds. As has been succinctly stated by Judge Abraham D. Sofaer:

> The law of finds is disfavored in admiralty because of its aims, its assumptions, and its rules. The primary concern of the law of finds is title. The law of finds defines the circumstances under which a party may be said to have acquired title to ownerless property. Its application necessarily assumes that the property involved either was never owned or was abandoned.... To justify an award of title (albeit of one that is defeasible), the law of finds requires a finder to demonstrate not only the intent to acquire the property involved, but also possession of that property, that is, a high degree of control over it.

> These rules encourage certain types of conduct and discourage others. A would-be finder should be expected to act acquisitively, to express a will to own by acts designed to establish the high degree of control required for a finding of possession. The would-be finder's longing to acquire is exacerbated by the prospect of being found to have failed to establish title. If either intent or possession is found lacking, the would-be finder receives nothing; neither effort alone nor acquisition unaccompanied by the required intent is rewarded.... Furthermore, success as a finder is measured solely in terms of obtaining possession of specific property; possession of specific property can seldom be shared, and mere contribution by one party to another's successful efforts to obtain possession earns no compensation.

> Would-be finders are encouraged by these rules to act secretly, and to hide their recoveries, in order to avoid claims of prior owners or other would-be finders that could entirely deprive them of the property.

*Hener v. United States*, 525 F.Supp. 350, 356 (S.D.N.Y.1981).

In sharp contrast to "the harsh, primitive, and inflexible nature of the law of finds" is the law of salvage.

> Admiralty favors the law of salvage over the law of finds because salvage law's aims, assumptions, and rules are more consonant with the needs of marine activity and because salvage law encourages less competitive and secretive forms of conduct than finds law. The primary concern of salvage law is the preservation of property on oceans and waterways. Salvage law specifies the circumstances under which a party may be said to have acquired, not title, but the right to take possession of property (e.g., vessels, equipment, and cargo) for the purpose of saving it from destruction, damage, or loss, and to retain it until proper compensation has been paid.

> Salvage Law assumes that the property being salved is owned by another, and thus that it has not been abandoned. Admiralty courts have adhered to the traditional and realistic premise that property previously owned but lost at sea has been taken involuntarily out of the owner's possession and control by the forces of nature at work in oceans and waterways; in fact, property may not be "salvaged" under admiralty law unless it is in some form of peril....

> Salvage law requires that to be a salvor a party must have the intention and the capacity to save the property involved, but the party need not have the intention to acquire it. Furthermore, although the law of salvage, like the law of finds, requires a salvor to establish possession over property before obtaining the right to exclude others, "possession" means something less in salvage law than in finds law. In the salvage context, only the right to compensation for service, not the right to title, usually results; "possession" is therefore more readily found than under the law of finds.... Moreover, unlike the would-be finder, who is either a keeper or a loser,

the salvor receives a payment, depending on the value of the service rendered, that may go beyond quantum meruit. Admiralty's equitable power to make an award for salvage—recognized since ancient times in maritime civilizations—is a corollary to the assumption of nonabandonment and has been applied irrespective of the owner's express refusal to accept such service. . . .

These salvage rules markedly diminish the incentive for salvors to act secretly, to hide their recoveries, or to ward off competition from other would-be salvors. . . . In short, although salvage law cannot alter human nature, its application enables courts to encourage open, lawful, and cooperative conduct, all in the cause of preserving property (and life).

*Id.* at 357–58; *see also* 3A *Benedict on Admiralty* § 158, at 11–15 to 11–16.

■ Today, finds law is applied to previously owned sunken property only when that property has been abandoned by its previous owners. Abandonment in this sense means much more than merely leaving the property, for it has long been the law that "[w]hen articles are lost at sea the title of the owner in them remains." *THE AKABA,* 54 F. 197, 200 (4th Cir.1893); *see also* 3A *Benedict on Admiralty* § 158, at 11–1 to 11–2; *Hener,* 525 F.Supp. at 357; *Wilkie, et al. v. Two Hundred and Five Boxes of Sugar,* 29 F.Cas. 1247 (D.S.C. 1796) (No. 17,662). Once an article has been lost at sea, "lapse of time and nonuser are not sufficient, in and of themselves, to constitute an abandonment." *Wiggins v. 1100 Tons, More or Less, of Italian Marble,* 186 F.Supp. 452, 456 (E.D.Va.1960); *see also Wilkie,* 29 F.Cas. at 1247 (length of time does not divest an original owner of his derelict property at sea). In addition, there is no abandonment when one discovers sunken property and then, even after extensive efforts, is unable to locate its owner. *Weber Marine, Inc. v. One Large Cast Steel Stockless Anchor and Four Shots of Anchor Chain,* 478 F.Supp. 973, 975 (E.D.La.1979).

While abandonment has been simply described as "the act of deserting property without hope of recovery or intention of returning to it," *Nunley v. M/V DAUNTLESS COLOCOTRONIS,* 863 F.2d 1190, 1198 (5th Cir.1989), in the lost property at sea context, there is also a strong *actus* element required to prove the necessary intent. *Zych v. The Unidentified, Wrecked and Abandoned Vessel,* 755 F.Supp. 213, 214 (N.D.Ill.1990); *THE NO. 105,* 97 F.2d 425, 426 (5th Cir.1938). "Abandonment is said to be a voluntary act which must be proved by a clear and unmistakable affirmative act to indicate a purpose to repudiate ownership." *THE PORT HUNTER,* 6 F.Supp. 1009, 1011 (D.Mass.1934). The proof that need be shown must be "strong . . ., such as the owner's express declaration abandoning title." T. Schoenbaum, *Admiralty and Maritime Law* § 15–7, at 512 (1987); *Hener,* 525 F.Supp. at 357; 3A *Benedict on Admiralty* § 158, at 11–16; *see also Brady v. The Steamship AFRICAN QUEEN,* 179 F.Supp. 321, 324 (E.D.Va.1960) (the law of finds should be applied only in "extreme cases where the property is wholly derelict and affirmatively abandoned by the owners and the underwriters"); and *Zych,* 755 F.Supp. at 214 ("A finding of abandonment must be supported by strong and convincing evidence").

■ There are only a handful of cases which have applied the law of finds, all of which fit into two categories. First, there are cases where owners have expressly and publicly abandoned their property. *See, e.g., Nunley,* 863 F.2d at 1199; *State ex rel. Ervin v. Massachusetts Co.,* 95 So.2d 902 (Fla.1956), *cert. denied,* 355 U.S. 881, 78 S.Ct. 147, 2 L.Ed.2d 112 (1957); *Nippon Shosen Kaisha, K.K. v. United States,* 238 F.Supp. 55 (N.D.Cal.1964); *Brady,* 179 F.Supp. at 322. In the second type of case, items are recovered from ancient shipwrecks and no owner appears in court to claim them. Such circumstances may give rise to an inference of abandonment, but should an owner appear in court and there be no evidence of an express abandonment, the law of salvage must be applied. We

agree with the author of *Admiralty and Maritime Law* that:

> In the treasure salvage cases, often involving wrecks hundreds of years old, the inference of abandonment may arise from lapse of time and nonuse of the property, or there may even be an express disclaimer of ownership. This calls for the application of the law of finds. By contrast, parties who intend to assert a claim of ownership may be identified. In such a case the law of salvage is applied.

§ 15–7, at 514 (footnotes omitted); *see also Hatteras, Inc. v. THE U.S.S. HATTERAS*, 1984 A.M.C. 1094, 1097 n. 5 (S.D.Tex.1981) ("While mere nonuse of property and lapse of time without more do not establish abandonment, they may, under circumstances where the owner has otherwise failed to act or assert any claim to property, support an inference of intent to abandon").

The case below appears to be the only reported decision involving salvaged treasure from ancient shipwrecks wherein a court has applied the law of finds despite the fact that the previous owner appeared in court. In all other finds law cases, no prior owner has appeared. One example is the *Treasure Salvors* set of cases, all of which involved the salvage of Spanish treasure ships sunk off the Florida Keys in 1622. Widely quoted is the Fifth Circuit's phrase that "[d]isposition of a wrecked vessel whose very location has been lost for centuries as though its owner were still in existence stretches a fiction to absurd lengths." *Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330, 337 (5th Cir. 1978). Yet the Court there also took the trouble to note that it had been stipulated by all parties involved that the original

owners had abandoned the wrecks, and the district court also made mention of the fact that, "The modern day government of Spain has expressed no interest in filing a claim in this litigation as a successor-owner." *Id.* at 336 n. 9; *Treasure Salvors, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel*, 556 F.Supp. 1319, 1334 n. 2 (S.D.Fla.1983). Another Spanish wreck, this time from the 1715 Plate Fleet, was involved in *Cobb Coin Co., Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel*, 525 F.Supp. 186 (S.D.Fla.1981), and there the Spanish government again made no claim of ownership.

In *Martha's Vineyard, supra*, which concerned the salvage of the S.S. REPUBLIC, a ship that "plummeted to a watery grave in 1909," the First Circuit made it a point to state that, "After petitioner brought its action *in rem* in the district court, no person or firm appeared to assert any overall claim of ownership." 833 F.2d at 1065. Likewise *Massachusetts v. Maritime Underwater Surveys, Inc.*, 403 Mass. 501, 531 N.E.2d 549 (1988), which involved salvage of "the notorious pirate ship WHYDAH," a vessel that sank in a storm off Cape Cod in April of 1717. There, the Supreme Judicial Court of Massachusetts noted that "American courts have applied the law of finds, rather than the law of salvage, in cases involving ancient shipwrecks where no owner is likely to come forward," *id.* 531 N.E.2d at 551, apparently after descendants of the illfated pirates made no attempt to rush into court and claim the booty.[2]

An example of a treasure salvage case where the original owner, or its successor in interest,[3] appeared and salvage law was

---

**2.** The other reported cases where no owner appeared and the law of finds was applied are *Klein v. The Unidentified Wrecked and Abandoned Sailing Vessel*, 758 F.2d 1511 (11th Cir. 1985) (Eighteenth Century English vessel); *Wiggins, supra,* (Norwegian bark carrying Italian marble which sank in 1894); *Rickard v. Pringle*, 293 F.Supp. 981 (E.D.N.Y.1968) (propeller from a 1902 shipwreck); *Chance v. Certain Artifacts Found and Salvaged From the NASHVILLE a/k/a the RATTLESNAKE*, 606 F.Supp. 801 (S.D.Ga.1984), *aff'd*, 775 F.2d 302 (11th Cir.

1985) (privately owned Confederate pirate ship sunk in 1863); and *Indian River Recovery Co. v. THE CHINA*, 645 F.Supp. 141 (D.Del.1986) (Nineteenth Century vessel).

**3.** Throughout our case, Columbus–America has made numerous mentions of the fact that the insurance underwriters are not the "original" owners of the gold, but rather assumed their ownership interests through subrogation. While Columbus–America appears to want the

applied is *Zych, supra.* In this case, the LADY ELGIN sank in 1860 on Lake Michigan, and claims were paid on the vessel and its cargo by Aetna Insurance Company. Because of the recent advances in technology necessary for deep water salvage, an independent salvor located the ship in the late 1980s and he, claiming finder status, attempted to have the district court declare him the owner. This claim was disputed by the Lady Elgin Foundation, to which Aetna's successor, CIGNA, had transferred its ownership interests in the wreck in April of 1990. The court, after noting "the law's hesitancy to find abandonment and the concomitant requirement that abandonment be supported by strong and convincing evidence," found that the vessel had not been abandoned. Aetna's successor in interest, the Lady Elgin Foundation, still retained its ownership interest, and the law of salvage, not finds, was applied. As for the 130 years during which no salvage was attempted, the court found that "Aetna was not required to engage in efforts to recover the wreck in order to avoid abandoning its interest when such efforts would have had minimal chances for success." 755 F.Supp. at 216.

■ In maintaining the position that previous owners can abandon sunken vessels even without any affirmative acts, Columbus–America relies especially on two state supreme court cases decided before the Civil War, *Eads v. Brazelton,* 22 Ark. 499 (1861) and *Wyman v. Hurlburt,* 12 Ohio 81 (1843). *Eads* involved the steamboat AMERICA which partially sank in the Mississippi River in 1827. The boat contained much valuable property, and in the two weeks after its sinking the owners conducted salvage operations in which they rescued all of the fur and government-owned specie on board, as well as one-half of the six hundred pigs of lead and a portion of the shot. Also, all of the machinery of the ship, including the boilers, was successfully removed. After this salvage, the owners physically abandoned the wreck and two years later an island began forming about it, on which trees would eventually grow to a height of thirty or forty feet.

The actual case concerned which of two would-be finders/salvors owned the remaining pigs of lead. As for the original owners, the Court declared that the cargo had been abandoned and then, in dicta, noted that "in extreme cases property wholly derelict and abandoned has been held to belong to the finder against the former owner." *Id.* at 509. Such was not the case here, though, for the former owners made no attempt to claim an ownership interest in the lead.[4] Because the boat and its contents were partially salvaged shortly after the wreck, the remaining cargo was easily salvageable for at least two years thereafter, and, most importantly, the original owners made no claim to the property once the remaining lead was salvaged, we find *Eads* inapposite.

The facts of *Wyman* are more on point, although we doubt its precedential value. There, a schooner, THE G.S. WILLIS, sank in Lake Erie during the fall of 1835. The next year it was raised by another party and $865 in specie was discovered in the cabin. Truman Wyman, the original owner of this money, then filed an action of trover in Ohio state court against the finders/salvors. The case was tried before a jury in the Supreme Court of Ashtabula County, and they returned a special verdict which included the finding that "at the time the said schooner was seized by the defendants, the same was abandoned by the plaintiff, and that said schooner was, on the day and year aforesaid, derelict property, and when found in the bottom of the Lake was worth nothing." 12 Ohio at 85.

---

insurers to possess only some type of second-class ownership interest in the gold, this is clearly not the law. Absent abandonment, insurance underwriters, or even those to whom the underwriters assign their interests—see, e.g., *Zych, supra*—retain the same interests as the "original" owners.

**4.** In fact, the only person originally connected with THE AMERICA who was mentioned by the Court, its Captain, Swan, far from claiming any ownership interest in the boat, actually supplied information to one of the salvors as to the location of the wreck.

A majority of the Ohio Supreme Court held for the finders/salvors, awarding them the entire amount. The Court based this decision on the jury's finding of abandonment, which the majority supposed was intended "to be understood that all hope, expectation, and intention to recover the property were utterly and entirely relinquished." *Id.* at 86–87. A seventy-two word dissenting opinion was filed, though, by Chief Justice Ebenezer Lane. Lane was "not entirely certain that [his brethren] adopt[ed] the true sense of the word 'abandoned,' [as it was employed] in the special verdict." Instead, the Chief Justice was "incline[d] to think the jury meant nothing more than a want of the plaintiff's pursuing active measures to reclaim his property, and not a positive relinquishment of his right. If this be the true meaning, it would change the judgment." *Id.* at 88.

Because of the meager information supplied by the court, it is impossible to know which of Wyman's acts, or omissions, the jury relied on in finding an abandonment.

Also, like Chief Justice Lane, we find it difficult to know exactly what the jury meant when it found the ship to have been "abandoned." What is clear, though, is that the Chief Justice was entirely correct when he stated that an abandonment of sunken cargo so as to lose possession must be shown not by the mere cessation of attempts to recover, but by the owner's positive relinquishment of his rights in the property. We find that this is the only principle of note to be gleaned from *Wyman*.[5]

▮▮ In conclusion, when sunken ships or their cargo are rescued from the bottom of the ocean by those other than the owners, courts favor applying the law of salvage over the law of finds. Finds law should be applied, however, in situations where the previous owners are found to have abandoned their property. Such abandonment must be proved by clear and convincing evidence, though, such as an owner's express declaration abandoning title. Should the property encompass an an-

---

5. Columbus–America also cites two other cases for the proposition that mere nonuse and lapse of time can lead to an abandonment, but neither of these cases lends any support to this argument.

In *Howard v. Sharlin*, 61 So.2d 181 (Fla.1952), the Supreme Court of Florida wrote an extraordinarily cryptic opinion from which it is difficult to ascertain any legal principle. Supposedly the plaintiff claimed an ownership interest in a derelict vessel, the schooner GENESSEE. It is not clear, though, how the vessel became derelict, where it was located, or under what circumstances the plaintiff obtained his supposed interest. The defendant, who had apparently salvaged the lead keel of the ship, claimed in reply that the plaintiff did not possess title or, alternatively, that the vessel had been abandoned. The Court laconically settled the issues by stating:

The testimony on the issues was voluminous, and no useful purpose would be served in here relating it. From our examination thereof, we have concluded that, regardless of the status of plaintiff's title, the evidence showed conclusively that there was an abandonment of the vessel "Genessee" and that she was a derelict at the time the defendant undertook to salvage the lead from her keel. *Id.* at 181.

If it is possible, the other case, *Steinbraker v. Crouse*, 169 Md. 453, 182 A. 448 (1936), lends even less support to Columbus–America's proposition. There, the Western Marine & Salvage Company ("Western Marine") in 1923 purchased

232 vessels which had formerly been federal government property. Western Marine stripped the vessels of all easily removable metal and then towed 169 of the hulls into Mallow's Bay, Charles County, Maryland. The hulls were then burned to the water's edge, after which they were pulled close to the shore so that metal salvaging could continue. Around March of 1931, though, Western Marine ceased its salvaging efforts and departed from the area, leaving behind only a security guard to look after its salvaging equipment on land. The next year, Western Marine sold both the land surrounding the wrecks and its equipment. After formal salvaging efforts had ceased, many local citizens began diving into Mallow's Bay to recover scrap metal from the wrecks. This continued openly for over two years, and although hundreds of tons of metal were removed and sold, Western Marine did nothing to stop the salvors nor did they demand any compensation. The price of metal began to rise, though, in 1934, and late that year Harry Steinbraker, a scrap dealer, contacted Western Marine and purchased its rights to the metal. Steinbraker then sought to enjoin the local salvors from their work, but the Maryland Supreme Court found that Western Marine had abandoned the hulls. Of course, it is foolhardy to attempt comparison between these facts and those in which a ship is involuntarily lost upon the high seas and salvage is not humanly possible for at least 125 years.

cient and longlost shipwreck, a court may infer an abandonment. Such an inference would be improper, though, should a previous owner appear and assert his ownership interest; in such a case the normal presumptions would apply and an abandonment would have to be proved by strong and convincing evidence.

## B.

■ Before addressing whether the district court correctly found that the insured shipments of gold were abandoned by the underwriters, several points should be noted. First, the CENTRAL AMERICA herself was self-insured, and successors in interest to the U.S. Mail and Steamship Company have made no attempt to claim an ownership interest in the wreck. Also, there appears to have been a fairly significant amount of passenger gold aboard, but this case, almost surprisingly, has failed to see descendants of any of the passengers attempt to gain a share of the treasure. Thus, an abandonment may be found, and Columbus–America may be declared the finder and sole owner, as to any recovered parts of the ship, all passenger possessions, and any cargo besides the insured shipments.[6]

■ As for the insured gold, to *"prima facially"* prove their ownership interests at trial, the underwriters produced several original documents: entries from the Atlantic Mutual's Vessel Disasters Book concerning the disaster (one of which contained the scribbled notation, "e[stimated] l[oss] $150,000"); records of Board resolutions to pay claims; minutes from an underwriters' board meeting discussing the CENTRAL AMERICA; a study prepared by the New York Board of Underwriters regarding the disaster; and the salvage contract between the underwriters and Brutus de Villeroi. The insurers also produced a great many period newspaper articles. These discussed the amount of trea-

sure on board; the insurers of this treasure and the amounts they insured; the willingness of the insurers to pay off claims; the general satisfaction the insureds received from having their claims promptly settled; and the salvage negotiations between the underwriters and the Boston Submarine Armor Company.

On appeal, Columbus–America exerts much effort in asserting that there exists insufficient evidence to prove that the underwriters who are now parties in this litigation actually insured and paid off claims upon the gold. The lower court, though, found *"prima facially"* that the underwriters did insure the treasure and that they received ownership interests in the gold once the claims were paid. Because of the extent of the catastrophe involved, and its feared repercussions in the American economy, newspapers around the country devoted much space and attention not only to the human aspects of the tragedy, but also the financial. Articles abounded on the quantity of gold aboard, its owners, and its insurers. Some of these articles do contradict others as to the exact amount certain underwriters insured. Still, we find that the district court did not err when it held that the underwriters who are now parties, or their predecessors in interests, paid off claims upon and became the owners of the commercial shipment of gold in 1857.

■ Despite finding that the underwriters owned the gold in 1857, the district court applied the law of finds and awarded Columbus–America the entire treasure. This was because at some point the insurers had abandoned their interests in the gold. On appeal, Columbus–America asserts that the lower court found an abandonment because of "20 distinct factors." It is clear, though, that the Court ruled as it did because of only two: the underwriters did nothing to recover the gold after 1858, and they supposedly destroyed all documentation they had regarding payment of claims for the gold.

6. Should Columbus–America be able to prove, for example from a location on the ocean floor inconsistent with the bulk of the treasure, that certain gold was, more likely than not, passenger gold, rather than part of the insured ship-

ment, this gold should be awarded to Columbus–America in its entirety. Also, should more than $1,219,189 (1857 valuation) of gold be rescued, Columbus–America should be found the owner of any surplus.

During trial, the underwriters did not produce any of the original insurance contracts with the insureds, statements from shippers that goods were aboard, bills of lading, or canceled checks or receipts from paying off the claims. While such documents would have existed in 1857, none could be located in 1990. Thus, because an insurance executive testified that the usual practice *today* is for insurance companies to destroy worthless documents after five years, the district court found that the above documentation concerning the CENTRAL AMERICA must have been intentionally destroyed in the ordinary course of business. Such destruction, coupled with 130 years of nonuse, equalled, according to the Court, an abandonment. Specifically:

> The insurance carriers destroyed their records relating to the events of the Central America. Exactly when is not shown, but evidence establishes it was their custom to keep records for some five year periods, and thereafter destroy them. However, one expert in marine insurance testified that if a company intended to assert its right to subrogation, it always maintained its documents of proof of the claim and that it had paid the claim, and the fact it disposed of such documents was an indication it abandoned its claim. It is difficult to believe that a company claiming an asset or property worth $150,000.00 in the 1800's or even early 1900's would destroy all evidence of its claim if it had any intention to pursue it, or any hope of recovery. How could one better demonstrate their intention to abandon a claim to or interest in property than to intentionally destroy every evidence of its claim, right or title thereto.... They deliberately destroyed every document that would in any way show they had an interest in such a claim and had any intention to pursue it. Why? Their actions speak clearly. They had no hope or idea they could locate the Central America, and even if they could locate it, they had no hope they could recover anything from it. They destroyed the documents and intended thereby to abandon any claim they might have.

> ... A clear intention of abandonment is given when all records or memorandum of the property are deliberately destroyed and no effort is made or undertaken to locate or recover the property for over a hundred years.

742 F.Supp. at 1344–45, 1348.

Contrary to the district court, we cannot find any evidence that the underwriters intentionally or deliberately destroyed any of their documents about the CENTRAL AMERICA. Instead, the only evidence we have is that after 134 years, such documents that may have once existed can no longer be located. With such a passing of time, it seems as, if not more, likely that the documents were lost or unintentionally destroyed, rather than being intentionally destroyed.

As has been mentioned above, a case very similar to ours is *Zych, supra.* There, in an opinion handed down after our case was decided below, the Northern District of Illinois held that the insurance company in question did not at any time abandon its interests in the wreck of THE LADY ELGIN prior to its 1990 contract with the foundation. In that case, the only evidence presented as to the actual insurance was six letters found in one of Aetna's letter books. Interestingly, no insurance documents, bills of lading, or claims documents were entered into evidence. The Court, though, distinguished its case from ours, as ours was related by our lower court's opinion, by explaining: "This case, of course, differs from *Columbus–America* in that there is no affirmative act, such as the destruction of documents, which indicates an intent by Aetna to abandon the wreck." 755 F.Supp. at 216. The Court did not explain, nor did it seem perturbed by, the loss of all of Aetna's documents concerning THE LADY ELGIN other than the six letters.

It is undoubtedly true that in our case some of the insurance documents from 134 years ago are missing. Yet, the underwriters did present several other original documents from their files concerning this case, and in at least one instance all the documents in an insurer's file on the CEN-

TRAL AMERICA were stolen by a would-be salvor. Also, almost all of the evidence in the record actually seems to indicate a specific predisposition on the underwriters' part not to abandon the treasure.

Shortly after the disaster, the underwriters negotiated with a salvage company about rescuing the gold, and the next year a salvage contract was formed between two of the insurers and Brutus de Villeroi. Nothing came of these efforts, and the issue lay dormant for 120 years. Still, it appears that the gold was not totally forgotten, for when the Atlantic Mutual Insurance Company ("Atlantic Mutual") wrote its official history in 1967, it devoted a couple of pages to the CENTRAL AMERICA tragedy and the company's salvage contract with de Villeroi.

Because of drastic advances in deep water salvage, the late 1970s witnessed a good many would-be salvors contacting various underwriters regarding the CENTRAL AMERICA. Atlantic Mutual and The Insurance Company of North America ("INA") opened their archives to these salvors, and several in turn sought to form salvage arrangements with the insurers. In particular was a Norman Scott, who, in 1978, claimed to have located the CENTRAL AMERICA. He approached Atlantic Mutual and INA in reference to forming a salvage contract, and they in turn proceeded to hire a New York law firm to locate the other underwriters and begin salvage negotiations. Scott, though, was mistaken as to his discovery, and no contract was ever formed.

Throughout the early and mid–1980s, would-be salvors continued to contact the underwriters for information on the wreck. Salvage contracts were sporadically discussed, but at no time did the insurers ever agree to abandon their ownership interests in the gold.[7] As late as 1987, INA was negotiating a salvage contract with Boston Salvage Consultants, Inc., whereby INA would receive two percent of any treasure recovered—before the parties could enter into a contract, though, the district court enjoined (through injunction box # 1) these and other salvors from working in the area where it was then thought the wreck lay. In addition, not only the American insurers, but also the British, entered into various salvage negotiations, the latter through their Salvage Association.

It is ironic that one of the salvors who contacted the underwriters in the 1980s was Columbus–America itself. The eventual salvor used Atlantic Mutual's extensive library for research and then, in 1987, it, through an attorney, wrote the following enigmatic letter to many of the underwriters:

> We are writing to a number of insurance companies on behalf of one of our clients. Our client is acquiring the rights to various 19th Century marine wrecks. If [your company] claims or asserts any interest in vessels or cargo which were wrecked in the Atlantic Ocean during the 19th Century and would consider conveying its claim or asserted interest, please get in touch with me.
>
> Our client would also be interested in obtaining or seeing any existing records upon which [your company] might assert a claim to any 19th Century wrecked vessel or its cargo.

Of course, none of the underwriters responded affirmatively to such a broad and mystifying request.[8]

 In conclusion, when a previous owner claims long lost property that was

**7.** One typical example is from 1980, when an Edwin R. Fite of Pascagoula, Mississippi, contacted Atlantic Mutual for information on the CENTRAL AMERICA, and also inquired as to "how much it would cost to purchase the insurance claims to this wreck?" Atlantic Mutual responded by suggesting that Mr. Fite contact the law firm it had hired for such requests, and the letter also stated, "we are not interested in relinquishing any rights with respect to the cargo."

**8.** Atlantic Mutual did write back and request additional information, and when this was furnished, the insurer responded, "It is our intention to retain any rights that may be due us under general maritime law (or otherwise) and accordingly we do not wish to convey any claims or interest to your client."

involuntarily taken from his control, the law is hesitant to find an abandonment and such must be proved by clear and convincing evidence. Here, we are unable to find the requisite evidence that could lead a court to conclude that the underwriters affirmatively abandoned their interest in the gold. Thus, we hold that the lower court clearly erred when it found an abandonment and applied the law of finds. Accordingly, the case is remanded to the district court for further proceedings.

### C.

On remand, the district court is to apply the law of salvage, and in so doing it must determine what percentage of the gold each underwriter insured. Equally, if not more, important, the Court must also determine the proper salvage award for Columbus–America. Although this is a decision that must be left to the lower court, we are hazarding but little to say that Columbus–America should, and will, receive by far the largest share of the treasure.

■ In setting a salvage award, a court of admiralty becomes a court of equity. *THE BOSTON*, 3 F.Cas. 932, 937 (C.C.D.Mass.1833) (No. 1,673) (Story, J.). Such an award "is a compensation for meritorious services, [and] it may properly be increased, diminished, or wholly forfeited, according to the merit or demerit of the salvor, in his relation to the property saved." W. Marvin, *A Treatise on the Law of Wreck and Salvage* § 218, at 226 (1858). An award for salvage "generally far exceeds a mere remuneration *pro opere et labore* —the excess being intended, upon principles of sound public policy, not only as a reward to the particular salvor, but, also, as an inducement to others to render like services." *Id.* § 97, at 105; *see also Mason v. THE BLAIREAU*, 6 U.S. (2 Cranch) 240, 266, 2 L.Ed. 266 (1804).

■ The Supreme Court has listed six "main ingredients" admiralty courts use when fixing an award for salvage:

(1.) The labor expended by the salvors in rendering the salvage service. (2.) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3.) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4.) The risk incurred by the salvors in securing the property from the impending peril. (5.) The value of the property saved. (6.) The degree of danger from which the property was rescued.

*THE BLACKWALL*, 77 U.S. (10 Wall) 1, 13–14, 19 L.Ed. 870 (1869).

We thoroughly agree with all six and, in cases such as this, would add another: the degree to which the salvors have worked to protect the historical and archeological value of the wreck and items salved. In *MDM Salvage, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel*, 631 F.Supp. 308 (S.D.Fla.1986), the Southern District of Florida held that such a factor may be heavily considered when exclusive salvage rights are sought.[9] This same court has also stated that, "there can be no suggestion that federal admiralty procedures sanction salvaging methods which fail to safeguard items and the invaluable archeological information associated with the artifacts salved." *Cobb Coin*, 525 F.Supp. at 208. We agree, and would only add that the converse to this latter statement is also true—salvors who seek to preserve and enhance the historical value of ancient shipwrecks should be justly rewarded.

From a distance, it appears that all seven of these considerations militate towards awarding Columbus–America a significant portion of the recovered gold. Of course, it

---

**9.** The Court stated:

No party in this action has engaged in independent historical research ... [n]or has any party made a real effort to preserve the archaeological integrity of the purported wreck site.... Archaeological preservation, onsite photography, and the marking of sites are particularly important in the instant context, as the public interest is compelling in circumstances in which a treasure ship, constituting a window in time provides a unique opportunity to create a historical record of an earlier era. These factors constitute a significant element of entitlement to be considered when exclusive salvage rights are sought.

631 F.Supp. at 310.

will be up to the district court to determine if this is actually the case and what salvage award should be given.

■ As for the logistics in making a salvage award, we believe that in a case such as this, an award *in specie* would be proper. *See, e.g., Cobb Coin,* 525 F.Supp. at 198 (when items salvaged are "uniquely and intrinsically valuable beyond their monetary worth, an award *in specie* is more appropriate"). Also, because salvaging efforts have not been completed, the lower court might want to consider denominating the award as a percentage of the total recovery, rather than as a set monetary amount—should a specific monetary award be set too high, the underwriters could end up receiving nothing, while if an award is set too low, Columbus–America would have a disincentive to completely recovering the gold.

No matter what exact award is given, though, we are confident that Columbus–America will be justly rewarded for its extensive efforts in salvaging the CENTRAL AMERICA.

### III.

The final issue on appeal concerns the claims of the intervenors, Columbia, John, and Grimm. At trial, the district court held that for the intervenors to be eligible for any recovery, they had to prove that Columbus–America made use of the information provided and that such "information lead to or assisted in locating the CENTRAL AMERICA." The Court then dismissed the intervenors' claim, finding that "there [was] no credible evidence in the record to establish either of these as a fact." 742 F.Supp. at 1339–40. On appeal, the intervenors claim that the reason such evidence was not in the record is that once intervention was allowed, the district court abused its discretion by not allowing any pretrial discovery.

■ The district court allowed Columbia, John, and Grimm to intervene, but only on the condition that they would begin trial the next day, thereby foregoing all pretrial discovery. Columbus–America now defends the Court's decision by stating that because the would-be intervenors waited until the eve of trial to attempt intervention, the Court had it within its discretion to deny the intervention, and thus, *a fortiori,* the Court also had the discretion to limit discovery. Whether the district court could have denied the intervention motion because of timeliness is an interesting question not before us.[10] Even if the intervention could have been denied, though, it does not follow that once intervention was allowed the Court could effectively deny all discovery.

■ When granting an application for permissive intervention, a federal district court is able to impose almost any condition, including the limitation of discovery. *See* 7C C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1922, at 50205 (2d ed. 1986). The intervention here, though, was an intervention of right, and historically most courts and commentators have held that conditions cannot be imposed on such intervention. *Id.* § 1922, at 505. In general, intervenors of right "assume the status of full participants in a lawsuit and are normally treated as if they were original parties once intervention is granted." *District of Columbia v. Merit Systems Protection Board,* 762 F.2d 129, 132 (D.C.Cir.1985).

The Advisory Committee Note to the 1966 amendment of Federal Rule of Civil Procedure 24(a) states that, "An intervention of right under the amended rule may be subject to appropriate conditions or re-

10. After Columbus–America reported finding the CENTRAL AMERICA in 1987, the intervenors had no reason to follow the case because the Court's first injunction box covered an area of the ocean approximately thirty miles from where Dr. Ryan had surveyed. In 1989, though, Columbus–America realized it had been salvaging the wrong ship and thus went to court and received a second injunction, this one covering the area where the ship actually lay. Columbus–America published the coordinates of this new area in its Supplemental Rule C notice in the *Virginian Pilot and Ledger Star* on September 7, 1989. While such publication is to give constructive notice, the intervenors did not have actual notice until February 1990, less than two months before they filed their petitions to intervene.

strictions responsive among other things to the requirements of efficient conduct of the proceedings." At least one prominent commentator, though, has questioned this conclusion, noting that the Committee "cites no authority for [its] statement." 7C *Federal Practice and Procedure* § 1922, at 505–06. Still, several courts have followed the Committee's advice and imposed reasonable conditions of a housekeeping nature. *Id.* § 1922, at 506–07. Presently, we need not decide if such conditions are ever proper, for we find that the Court's denial of discovery here was clearly unreasonable.

While the efficient administration of justice is always an important consideration, fundamental fairness to every litigant is an even greater concern. In *Freehill v. Lewis*, 355 F.2d 46, 48 (4th Cir.1966), we stated:

> the spirit of the rules does not require that completeness in the exposure of issues in the pretrial discovery proceedings be sacrificed to speed in reaching the ultimate trial on the merits. Delay should be avoided to the extent that it is unnecessary or unreasonable but adequate time must be allowed for discovery of the facts and assembly of the proof.

Of course, what is ironic about our case is that an unconditional granting of intervention would not have necessarily caused any delay at all. The Court had earlier bifurcated the trial so that the first phase only concerned whether the underwriters had abandoned the gold; should no abandonment be found, a second phase, examining what the underwriters actually insured and setting the proper salvage award, would also be necessary. The intervenors asked the lower court to try their issue during the second phase of the trial, or, if a second phase were not necessary, at some later time. To us, this request appears perfectly logical: the original trial could begin and proceed as scheduled; the intervenors would have a reasonable time for discovery; and the abandonment portion of the trial would not be complicated by the addition of a totally unrelated issue. Also, considering the strong and convincing proof necessary for a finding of abandon-

ment, the necessity of having a second phase should have appeared fairly certain to the district court. The Court, though, denied the intervenors' request and forced them to begin trial without any discovery.

"Due process mandates that a judicial proceeding give all parties an opportunity to be heard on the *critical and decisive allegations* which go to the *core* of the parties' claim or defense and to present evidence on the contested facts." *Complaint of Bakers Trust Company*, 752 F.2d 874, 890 (3d Cir.1984) (emphasis in original). Also, we agree with Justice Black that, "No judge is granted power ... to completely deny a party all opportunity to take depositions or to get affidavits essentially needed to get a fair trial of his case." *First National Bank v. Cities Service Co.*, 391 U.S. 253, 306, 88 S.Ct. 1575, 1601, 20 L.Ed.2d 569 (1968) (Black, J., dissenting). We thus find that the district court abused its discretion by forcing the intervenors to begin trial without an opportunity for any discovery. Accordingly, this portion of the case is reversed and remanded for discovery and a new trial. Should it be found that Columbus–America used the intervenors' information and such use contributed to the discovery of the CENTRAL AMERICA, a salvage award could be proper.

REVERSED AND REMANDED.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

Erasmus is a tough act to follow.

But even tougher is the Supreme Court of the United States.[1]

In *Bessemer City*, of course, the Court emphasized that the findings of fact of a district court, especially when the judge has heard the witnesses *ore tenus* in open court, shall not be set aside unless clearly erroneous, with due regard being given to the opportunity of the trial court to judge the credibility of the witnesses. In that decision, the Court reminded us of several principles that should be repeated here: "a reviewing court [must not] reverse the

---

**1.** *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

finding of the trier of fact simply because it is convinced that it would have decided the case differently," 470 U.S. at 573, 105 S.Ct. at 1511; "appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*," 470 U.S. at 573, 105 S.Ct. at 1511; "[w]here there are two permissible views of evidence, the factfinder's choice between them cannot be clearly erroneous," 470 U.S. at 574, 105 S.Ct. at 1511; and "[t]his is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." 470 U.S. at 574, 105 S.Ct. at 1511.

In deciding this case, we must couple the deferential standard of review of factual findings set forth in *Bessemer City* with the law, unmentioned in the majority opinion, that a finding of abandonment is a factual finding subject to the clearly erroneous standard. *Nunley v. M/V DAUNTLESS COLOCOTRONIS*, 863 F.2d 1190, 1198 (5th Cir.1989); see also *Bunge Corp. v. Agri–Trans Corp.*, 542 F.Supp. 961, 969 (N.D.Miss.1982), aff'd in part, vacated in part on other grounds, 721 F.2d 1005 (5th Cir.1983); *Williamson v. Mennella*, 248 A.D. 911, 290 N.Y.S. 645 (1936); *The Port Hunter*, 6 F.Supp. 1009, 1011 (D.Mass. 1934); *De Bardeleben Coal Co. v. Cox*, 16 Ala.App. 172, 76 So. 409, 410 (1917), cert. denied, 200 Ala. 553, 76 So. 911 (1917); *Steinbraker v. Crouse*, 169 Md. 453, 182 A. 448 (1936); *H.B. Chermside, Jr., Annotation, Rights In and Ownership of Wrecked or Derelict Vessels and Their Contents Not Cast Upon the Shore*, 63 A.L.R.2d 1369, 1373 3[b]; 1 C.J.S. *Abandonment* § 11; *City of New London v. Pequot Point Beach Co.*, 112 Conn. 340, 152 A. 136, 138 (1930) (real property); *Bennett v. Bowers*, 238 Iowa 702, 28 N.W.2d 618, 620 (1947) (real property); *Ray Coal Mining Co. v. Ross*, 169 Iowa 210, 151 N.W. 63, 65 (1915) (lease); *Cadillac Oil & Gas Co. v. Harrison*, 196 Ky. 290, 244 S.W. 669, 671 (1922) (lease); *Anson v. Tietze*, 354 Mo. 552, 190 S.W.2d 193, 196 (1945) (real property); *Newman Signs, Inc. v. Hjelle*, 317 N.W.2d 810, 817 (N.D.1982) (signs); *Llewellyn v. Philadelphia &*

*Reading Coal & Iron Co.*, 308 Pa. 497, 162 A. 429, 430 (1932) (personal property); *McMillin v. Titus*, 222 Pa. 500, 72 A. 240, 244 (1909) (lease); *Jordan v. State*, 107 Tex.Crim. 414, 296 S.W. 585, 587 (1927) (personal property); *Garrett v. South Penn Oil Co.*, 66 W.Va. 587, 66 S.E. 741, 745 (1909) (lease). I am convinced that the majority decision is incorrect in its principal holding that the district court's factual finding of abandonment was clearly erroneous; in applying the law of salvage to a long lost wreck; in making factual findings as an appellate court; and in erroneously stating the issue to be decided by the district court on remand. In addition, I would hold that the district court did not abuse its discretion in attaching conditions to the untimely motions for intervention.

### Finding of Abandonment

In my view, throughout its opinion, the majority has disregarded the rules set forth by the Supreme Court in *Bessemer City*. The majority, in contravention of the mandate that "[w]here there are two permissible views of evidence, the factfinder's choice between them cannot be clearly erroneous," reverses the district court's factual finding as clearly erroneous simply because, in my opinion, "it would have decided the case differently." *Bessemer City*, 470 U.S. at 573–74, 105 S.Ct. at 1511–12.

The district court found as a fact that the property taken from the CENTRAL AMERICA had been abandoned by its owners. I would hold that the district court was not clearly erroneous in making that determination. The circumstances of the insurance companies' failure to retain any indicia of ownership, such as bills of lading or commercial invoices, or to make any attempt to recover the property since 1858, coupled with the passage of more than 100 years, is ample evidence (not to mention details) to support the district court's finding that any claim the insurance companies may have had in the cargo of the CENTRAL AMERICA has been abandoned.

The majority holds that the district court committed clear error in finding abandon-

ment because it was "unable to find the requisite evidence that could lead a court to conclude that the underwriters affirmatively abandoned their interest in the gold," and specifically, the majority could not "find any evidence that the underwriters intentionally or deliberately destroyed any of their documents about the CENTRAL AMERICA." Majority op. at 467–468. In my opinion, both the district court's finding of abandonment and its specific finding that the underwriters intentionally destroyed the documents are amply supported by the evidence.[2] The majority's holding, by necessary implication, must be that abandonment can only be shown by an express statement by the owner indicating his intention to abandon. This holding, in my opinion, cannot be reconciled with established precedent. Abandonment may be inferred from all of the relevant facts and circumstances and may be determined on the basis of circumstantial evidence. See *Hatteras, Inc. v. The U.S.S. Hatteras*, 1984 A.M.C. 1094, 1097 n. 5 (S.D.Tex.1981) ("A formal declaration is not necessary; abandonment may be inferred from acts and conduct of an owner clearly inconsistent with an intention to return to the property, and from the nature and situation of the property."); *City of New London v. Pequot Point Beach Co.*, 112 Conn. 340, 152 A. 136, 138 (1930) (real property) ("intent [to abandon] may be inferred as a fact from the surrounding circumstances"); *Llewellyn v. Philadelphia & Reading Coal & Iron Co.*, 308 Pa. 497, 162 A. 429, 430 (1932) (personal property) ("intention

[to abandon] may, and indeed often must be, inferred from acts"); *Pierce v. Bemis (The Lusitania)*, [1986] 1 Q.B. 384, 389 ("So far as the owners of the contents are concerned, it is a necessary inference from the agreed facts and from the lapse of 67 years before any attempt was made to salve the contents that the owners of the contents abandoned their property"); 1 Am.Jur.2d *Abandoned, Lost, and Unclaimed Property* § 40 ("it is not necessary to prove intention to abandon by express declarations or other direct evidence").

Testimony was presented, for example, that the practice of the marine insurance industry is to require that the insured present a commercial invoice and a bill of lading prior to a claim being paid, and that the practice in that industry is much the same today as it was in 1857. The insurance company then retains those documents as proof of ownership with potential salvors. None of the insurers in this action produced any invoices or bills of lading regarding shipments on the CENTRAL AMERICA. (Atlantic Mutual—J.A. 991, 999; London Assurance and the Alliance Assurance Co.—J.A. 1054, 1069; Royal Exchange Assurance—J.A. 1105–1105A; Indemnity Marine Assurance Company—J.A. 1131; Salvage Association—J.A. 1153; Insurance Company of America—J.A. 1195). The marine insurance companies involved routinely destroy their records on a periodic basis. However, they do not destroy documents so long as they retain an interest in the cargo of which the documents reflect own-

---

**2.** The majority makes much of the fact that the documents may have been lost or stolen. As I have stated, I think the evidence establishes that the most likely inference is that the documents were destroyed, in the regular course of business, as worthless. In any event, I believe resolution of the question of whether the documents were destroyed or lost is unnecessary to a finding of abandonment. The insurance companies affirmatively abandoned any property interest they had in the cargo of the CENTRAL AMERICA by not maintaining the indicia of ownership they may have had at one time pertaining to the cargo on the CENTRAL AMERICA. We cannot know, more than 100 years after the fact, why the relevant documents are no longer in the possession of the insurance companies. However, we do know that any documentation that may have existed was in the control of the insurance companies and they no longer have these documents. Had they believed that a situation would arise where they would need to prove that they had paid claims on the cargo, they certainly would have taken steps to maintain and protect the documents pertaining to the CENTRAL AMERICA. The fact that the companies do not know when the documents were last in their possession or the circumstances of their removal is sufficient evidence that they viewed the documents as worthless. The obvious inference to be drawn from the fact that the insurance companies did not maintain their documents or any record of their documents is that they had abandoned their claims to the property.

ership.[3] It is doubtlessly expensive to maintain all records which an insurance business generates, therefore the companies have made the business decision not to keep documents which are unnecessary. The obvious, most logical, and clearly permissible inference from the fact that the insurance companies did not retain any documents pertaining to the CENTRAL AMERICA is that, at some point during the past hundred and thirty-odd years, the companies, giving up any expectation of ever recovering the property, destroyed their documents and, in so doing, evidenced their abandonment of their claims to the CENTRAL AMERICA.[4] See *Wyman v. Hurlburt*, 12 Ohio 81, 87 (1843) (vessel is abandoned when "all hope, expectation, and intention to recover the property were utterly and entirely relinquished" by the owner); *U.S. v. Smiley*, 27 F.Cas. 1132, 1134 (Cir. Ct.N.D.Cal.1864) (Justice Field) (cargo from shipwreck was abandoned when "all efforts to recover the property had been given up" by the owners.)

Indeed, I further submit that the specific finding that the insurance companies destroyed their documents is amply supported in the record by both direct and circumstantial evidence. The following testimony of one Richard Smith, Atlantic Mutual's representative at trial, is sufficient, in and of itself, to support the district court's finding:

Mr. Davey (Attorney for Columbus–America): You don't have any of the policies today that may have covered goods on board the CENTRAL AMERICA, do you?

Mr. Smith: At present we do not.

Mr. Davey: To the best of your knowledge, they have all been routinely destroyed along with the other business records of the company?

Mr. Smith: That's correct.

\* \* \* \* \* \*

Mr. Davey: So that the bills of lading which would have been taken up as part of the proof of loss have been destroyed as a matter of course?

Mr. Smith: If they had been taken up, they probably would have been destroyed in that and/or we moved several times. They could have been missing in that. Probably in the destruction when we destroyed the claim files if they existed. They would have been destroyed.

\* \* \* \* \* \*

Mr. Davey: But any record of sale would have been destroyed in the ordinary course of your business just like the insurance policies, the bills of lading and commercial invoices and everything else?

Mr. Smith: Yes, sir, if one existed.

Evidently, the majority did not consider this testimony, as it states that the district court held that the documents were intentionally destroyed "because an insurance executive testified that the usual practice *today* is for insurance companies to destroy worthless documents after five

---

**3.** Testimony at trial concerning the companies' document retention policies was typified by an insurance company representative who was asked, "And if you thought there was any hope of recovering goods, you would not let those documents be destroyed, would you?" He replied, "No, I wouldn't."

London Assurance's representative testified that a marine insurance company would keep the documents for so long as the company retained an interest in lost cargo. Representatives for Royal Exchange Assurance and Indemnity Marine Assurance each testified that their company's policy was to retain documents for so long as it feels they are necessary and disposed of only when they serve no purpose whatsoever.

**4.** The majority writes that because of the long passage of time, "it seems as, if not more, likely that the documents were lost or unintentionally destroyed, rather than being intentionally destroyed." Maj. op. at 466. Not only is this a factfinding by a court of appeals, opposite to the inference drawn by the district court and contrary to *Bessemer City*, the majority also puts the onus on the finders to prove that the insurance companies' destruction of documents pertaining to the CENTRAL AMERICA was deliberate. In the absence of any showing to the contrary, I would place the burden on those who last had possession of the documents to establish that they were "lost or unintentionally destroyed." Indeed, standard learning is that the failure of a party who possesses a document to produce it permits an inference that its tenor is unfavorable to the party's cause. See *Missouri, K. & T. Ry. Co. v. Elliott*, 102 F. 96, 101–103 (8th Cir. 1900); *Wigmore on Evidence, Chadbourn* (1979) 285, 291.

years...." Majority op. at 466 (emphasis supplied by the majority). Even that contention of the majority is also incorrect, I submit, because testimony was presented, not just as to the current practice, but as to the document destruction policies of the companies for more than 40 years. The insurance companies' representatives testified that, for as long as they had worked for the companies (which in some cases was over 40 years), the companies had document destruction policies in place.[5]

The majority's holding that "it seems as, if not more, likely that the documents were lost or unintentionally destroyed, rather than being intentionally destroyed," illustrates the majority's misconception of our role on appeal. It is not our role to decide a case on appeal based on which factual inference we would draw from the evidence. See Bessemer City, 470 U.S. at 573–74, 105 S.Ct. at 1511–12. Rather we should only determine if the factual inferences drawn by the district court are supported by the evidence. In addition to the clear testimony of Atlantic Mutual's representative that the policies covering goods on the CENTRAL AMERICA were destroyed and that the bills of lading were probably destroyed, the evidence showed that not one of the numerous insurance companies involved in this litigation was able to produce any of the documents that would have to be produced prior to a claim being paid, and that the companies destroy documents on a routine basis. In my opinion, these facts fully support the inference drawn by the district court, but rejected by the majority, that the documents were intentionally destroyed.

In addition, the passage of over 130 years since the cargo was lost is strong circumstantial evidence of abandonment.[6] And, as the First Circuit has stated in Martha's Vinyard, 833 F.2d at 1065, when "articles have been so long lost that time can be presumed to have eroded any realistic claim of original title, and ... those articles are now in hand, having been actually recovered, the better-reasoned authorities agree that the law of finds may appropriately be utilized." See Chance v. Certain Artifacts Found and Salvaged, 606 F.Supp. 801, 804 (S.D.Ga.1984), aff'd without opinion, 775 F.2d 302 (11th Cir.1985) ("Under the law of finds, the inference of

---

5. Alan John Birch, who appeared as a representative of claimants London Assurance and the Alliance Assurance Company, began in the marine claims business 43 years ago for London Assurance. He testified that the longest period of document retention that he was aware of at the company was 10 years, and that so long as the company retained an interest in lost cargo, it would not destroy the documents with respect to the loss.

Richard Smith, Atlantic Mutual's representative, has worked for the company for 30 years. He testified that during his entire tenure at Atlantic Mutual, the company has had a document destruction policy, under which it destroys claim files and other documents after from five to 10 years.

6. I would hold that long-lost wrecks such as the one in question here are presumptively abandoned. See Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked and Abandoned Steam Vessel, 833 F.2d 1059, 1065 (1st Cir.1987) (law of finds applies when "articles have been presumptively abandoned, i.e., either affirmatively renounced, or so long lost that time can be presumed to have eroded any realistic claim of original title....") (emphasis added). "Disposition of a wrecked vessel whose very location has been lost for centuries as though its owner were still in existence stretches a fiction to absurd lengths." Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel, 569 F.2d 330, 337 (5th Cir.1978). In Treasure Salvors, the Fifth Circuit held that disposition of the treasure retrieved from a Spanish galleon, the NUESTRA SENORA DE ATOCHA, sunk in 1622 and found near the Marquesas Keys in the Gulf of Mexico, should be governed by the law of finds rather than salvage law.

Under the law of finds, title is vested in "the first finder lawfully and fairly appropriating it and reducing it to possession, with the intention to become its owner." 569 F.2d at 337, quoting Rickard v. Pringle, 293 F.Supp. 981, 984 (E.D.N.Y.1968). Salvage law provides that the original owner maintains ownership and the recoverer only receives a salvage award.

The majority attempts to distinguish Treasure Salvors from the instant case on the fact that the parties in Treasure Salvors had stipulated that the ATOCHA had been abandoned by its original owner, the Spanish government. Nothing in the court's opinion indicates that the decision would have been any different had the Spanish government appeared in court to assert a claim. The parties merely stipulated to an obvious fact, that the long lost ship was abandoned.

abandonment may arise from lapse of time and nonuse of the property ... since THE NASHVILLE has rested at the bottom of the Ogeechee, unclaimed by its owner since 1863, this court concludes that the law of finds applies.") As the amount of time since the loss of the ship increases, the strength of the presumption that the property has been abandoned, stated above, increases, I suggest. In this case, more than 130 years is sufficient to establish a very strong presumption that the property has been abandoned.[7]

At the risk or repetition, I again state that I think the majority's out-of-hand dismissal as clearly erroneous the district court's finding of abandonment is quite contrary to law, for the inferences and factual conclusions made by the district court are supported by the evidence. Indeed, even as to lack of weight, the weakness of the evidence relied upon by the majority is exposed by only casual analysis. The majority writes that "almost all of the evidence in the record actually seems to indicate a specific predisposition on the underwriters' part not to abandon the treasure." Majority op. at 467. However, all the majority points to in support of this proposition is evidence of salvage negotiations in the 1860's involving two of the insurers, the fact that Atlantic Mutual, in its official history, written in 1967, devoted a couple of pages to the tragedy, and the insurers' actions from the late 1970's to the present upon being contacted by potential salvors concerning their potential claims. Majority op. at 467–468.

Evidence of salvage negotiations from the 1860's is, of course, of little consequence in determining if the insurers abandoned their claims subsequent to the 1860's. And the very fact that the 1860's efforts at salvage were either abandoned or not undertaken is, indeed, evidence of abandonment. In fact, it is highly likely that at the time the insurers explored the 1860's salvage options, they possessed all the documentation concerning their claims. They knew those documents would be necessary to establish the amounts of their claims. It was probably not until after the salvage operations proved unsuccessful that the insurers abandoned their claims. They destroyed the only documentation that would be necessary to prove the amounts of their claims when, at a later time, they lost all hope of recovering the property. In so doing, the district court held there was evidence of abandonment, and I agree.

The fact that Atlantic Mutual mentioned the CENTRAL AMERICA tragedy in its official history is, in my view, no evidence of a "specific predisposition" not to abandon the property. It indicates no more for Atlantic Mutual than that Atlantic Mutual, which believed it was an insurer of some of the cargo, found the sinking of the CENTRAL AMERICA to have been an interesting historical matter in the company's history. Indeed, the fact that that history shows that Atlantic Mutual has *even now* retained some papers referring to the CENTRAL AMERICA, but not the papers necessary to prove a claim or even the amount of the loss, is evidence that the matter was later abandoned.

Finally, evidence of the insurers' actions concerning their potential claims from the 1970's to the present is of little consequence in determining whether the insurers abandoned their claims prior to the 1970's. Property, once abandoned, cannot be reclaimed absent possession. See 1 C.J.S. *Abandonment* § 12. It is apparent that

---

7. The difficulty in adjudicating rights concerning cargo on a ship lost for 135 years is underscored by the Herculean task facing the district court on remand. Contrary to the majority's assertion that "[w]ithout doubt, most, if not all, of the claims were promptly paid off by the underwriters," at 456–57, there is doubt as to how much of the cargo was actually insured and, just as importantly, which insurance claims were actually paid. The only evidence available is speculative newspaper accounts from the 1850's. On remand, the district court will be faced with the difficult, if not impossible, task of determining which claims were paid by the insurance companies and in what amounts. This problem is caused by the insurance companies' failure to maintain the records necessary to establish their claims. Had the insurance companies not abandoned their claims they surely would have maintained the records necessary to establish their amount.

the insurers abandoned the property because at the time they did so, they had no hope of ever recovering it. Clearly, once the technology became available following World War II to make recovery a possibility, the insurers would not agree that they had abandoned any claim. This explains their activity in the recent past and their establishment of files. However, since property, once abandoned, cannot be reclaimed absent possession, in my view their 1970's and subsequent activity is of little consequence in determining whether they abandoned their claims at some point during the previous 120 years. A property interest abandoned as valueless cannot be revived simply because new technology, some 120 years later, has made the abandonment seem to have been error. In fact, an equally or more valid inference than the one drawn by the majority is that the insurance companies' creation of files in the 1970's and '80's, pertaining to the CENTRAL AMERICA, supports the conclusion that they had abandoned their claims.[8] These files were created when potential salvors contacted the insurance companies in the 1970's and '80's.[9] Had each insurer not abandoned its claim earlier, there would have been no need to create a file because one would have existed since 1857. By reasonable inference, each insurer believed the cargo it insured on the CENTRAL AMERICA was irretrievably lost and any property interest it had in the cargo was worthless. As a consequence, each insurer abandoned what to them was a worthless interest in the cargo.

Also, it is interesting that, even after the technology for recovering the CENTRAL AMERICA became available, the insurers did not enter into any salvage contracts concerning its recovery. They did nothing to recover the property, just as they had done for the past 130–plus years.

As I have shown, the evidence offered by the majority provides little support for its argument that the insurers did not abandon their claims. In my opinion, the majority's substitution of its judgment as to the facts is even more improper when, as here, there is ample support in the record for the district court's factual finding of abandonment.

*Finds v. Salvage*

I disagree with the majority's decision to apply the law of salvage to the facts of this case. It appears to base its decision on the erroneous belief that courts favor applying salvage law rather than the law of finds. Majority op. at 460. In fact, in the context of long lost wrecks, such as the instant case, courts, almost without exception, apply the law of finds. *Martha's Vineyard Scuba Headquarters v. Unidentified, Wrecked and Abandoned Steam Vessel,* 833 F.2d 1059, 1065 (1st Cir.1987) (ocean liner sunk in 1909); *Klein v. Unidentified Wrecked and Abandoned Sailing Vessel,* 758 F.2d 1511, 1514 (11th Cir.1985) (English ship sunk in eighteenth century); *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330, 337 (5th Cir.1978) (Spanish galleon sunk in 1622); *Sub–Sal, Inc. v. The DeBraak,* No. 84–296, 1992 WL 39050, at * 1–2, 1992 U.S. Dist. LEXIS 2461, at * 6–7 (D.Del.1992) (British ship sunk in 1798); *Zych v. Unidentified, Wrecked and Abandoned Vessel,* 746 F.Supp. 1334, 1343–44 n. 12 (N.D.Ill.1990), vacated, 941 F.2d 525 (7th Cir.1991) (steamer sunk in 1860); *Jupiter Wreck, Inc. v. Unidentified Sailing Vessel,* 691 F.Supp. 1377, 1385 (S.D.Fla.1988) (Spanish galleon sunk in seventeenth century); *Indian River Recovery Co. v. The China,* 645 F.Supp. 141, 144 (D.Del.1986) (ship sunk in nineteenth century); *Chance v. Certain Artifacts Found and Salvaged from the NASHVILLE,* 606 F.Supp. 801, 804 (S.D.Ga.1984) (Confederate raider sunk in 1863); *Wiggins v. 1100 Tons, More or Less, of Italian Marble,* 186 F.Supp. 452,

---

**8.** For the most part, these files contained nothing more than newspaper clippings and letters from potential salvors.

**9.** The fact that would-be salvors contacted some of the insurance companies is, of course, of no consequence in determining whether the property was abandoned. A reasonable person might seek to avoid litigation with potential claimants by obtaining assignments of any possible claims they may have.

456 (E.D.Va.1960) (Norwegian ship sunk in 1894); *Commonwealth v. Maritime Underwater Surveys, Inc.*, 403 Mass. 501, 531 N.E.2d 549, 552 (1988) (pirate ship sunk in 1717); see also Schoenbaum, *Admiralty and Maritime Law* § 15–7, p. 514 (1987) ("In virtually all of the treasure salvage cases involving wrecks of great antiquity, the law of finds, not salvage, is appropriate ...") Even *Benedict on Admiralty*, from which much of the majority's opinion appears to have been derived, would apply finds law to "long lost wrecks." See 3A Norris, *Benedict on Admiralty*, § 158, p. 11–17 (1992).

Modern courts have rejected application of the law of salvage in the context of long lost wrecks because, under the law of salvage, even an abandonment does not divest the owner of title. See 3A Norris, *Benedict on Admiralty*, § 150, p. 11–1 (1992) ("Should a vessel be abandoned without hope of recovery or return, the right of property still remains in her owner."); *Sub-Sal, Inc. v. The DeBraak*, No. 84–296, 1992 WL 39050, at *1–2, 1992 U.S. Dist. LEXIS 2461, at *6–7 (D.Del.1992) ("Cognizant that the application of salvage law involves a presumption that the owner of an abandoned vessel has not been divested of title, this Court rejects the salvage law theory."). The major premise of salvage law, that the property to be salved is owned by persons other than the salvor, is inapplicable in the case of long lost wrecks. See Schoenbaum, *Admiralty and Maritime Law*, § 15–7, p. 512 (1987).

The majority opinion breaks with the law of every other circuit that has decided the question and holds salvage law to be applicable to long lost wrecks. See *Martha's Vineyard Scuba Headquarters v. Unidentified, Wrecked and Abandoned Steam Vessel*, 833 F.2d 1059, 1065 (1st Cir.1987) (ocean liner sunk in 1909); *Klein v. Unidentified Wrecked and Abandoned Sailing Vessel*, 758 F.2d 1511, 1514 (11th Cir. 1985) (English ship sunk in eighteenth century); *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330, 337 (5th Cir.1978) (Spanish galleon sunk in 1622). I agree with our sister circuits that "[d]isposition of a wrecked vessel whose very location has been lost for centuries as though its owner were still in existence stretches a fiction to absurd lengths." *Treasure Salvors, Inc.*, 569 F.2d at 337.

### Impermissible Factfinding

Also, the majority has disregarded well-established law that appellate courts should not engage in factfinding. The majority has decided, on appeal, that the insured shipment was worth $1,219,189 (1857 valuation) when the amount of the insured shipment was not an issue before the district court. Majority op. at 465 n. 6.

The trial before the district court was to be bifurcated. The first portion was to decide if the insurers or anyone else could establish a claim to portions of the cargo. The second part of the trial was to involve a determination of the amount to be awarded to any claimants who established they had a valid claim. However, the second part of the trial was never held since the district court determined that no one other than Columbus–America had established a right to any of the cargo. Therefore, the question of how much of the shipment was insured was not before the district court and should not be decided in the first instance by this court.

In addition, the majority finds as a fact that the insurers had established an ownership interest in the cargo. Majority op. at 465–466. The majority attempts to disguise its factfinding by attributing a holding to the district court that was, in fact, never made by it. The majority writes that "the district court did not err when it held that the underwriters who are now parties, or their predecessors in interests, paid off claims upon and became the owners of the commercial shipment of gold in 1857." Majority op. at 465. The district court did not hold that the underwriters had paid claims and become owners of the commercial shipment. The district court did not decide the factual issue of whether the insurers had proven that they had an ownership interest in the cargo because the district court clearly was satisfied, as am I, that in any

event the cargo had been abandoned.[10] Since the district court did not decide the factual question of whether the insurers had established that the claims were ever paid, it is entirely improper for this court to make that factual ruling at this juncture. On remand, the district court should be given an opportunity to fully address the issue of whether the insurers met their burden of proof in establishing an owner-ship interest in the cargo and, in its proper role as a finder of fact, to decide that issue in the first instance.

### Issue on Remand

In my view, the majority has incorrectly stated the issue to be determined on re-mand. It writes that the district court "must determine what percentage of the gold each underwriter insured." Majority op. at 468. This ignores the fact that the insurers only became owners of cargo to the extent of their payment of claims. The amount they insured is irrelevant. The crucial fact is how much cargo they actual-ly paid claims on. The burden is on the insurance companies to establish the amount of claims that they actually paid.

### Intervention Motion

I also disagree with the majority's hold-ing that the district court abused its discre-tion by allowing Columbia University, Har-ry John, and Jack Grimm to intervene on the eve of trial only on the condition that the trial go ahead as scheduled. The trial was set for April 3, 1990. On March 29, 1990, John and Grimm filed their motion to intervene. Columbia filed its motion on April 2, 1990. It would have been well within the district court's discretion to deny the motions to intervene as untimely. See *Gould v. Alleco, Inc.*, 883 F.2d 281, 286 (4th Cir.1989), cert. denied, 493 U.S. 1058, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990) ("This Circuit has stressed the importance of time-liness and the wide discretion afforded the district courts."); *NAACP v. New York*, 413 U.S. 345, 365–66, 93 S.Ct. 2591, 2602–03, 37 L.Ed.2d 648 (1973) (district court's ruling on timeliness will not be disturbed on appeal unless the court abused its dis-cretion). In determining whether a motion to intervene is timely, courts look at how far the suit has progressed, the prejudice which delay might cause other parties, and the reason for the tardiness in moving to intervene. *Gould*, 883 F.2d at 286. In this case, the motions for intervention were filed on the eve of trial after all pre-trial discovery had been performed by the par-ties then in the suit. Any delay in the commencement of the trial would have prejudiced Columbus–America as its ability to attract funding was directly impacted by resolution of the issues concerning owner-ship of the cargo, and key members of the recovery team were required at trial and a delay in the trial would have interfered with Columbus–America's recovery efforts. Finally, there was no excuse for the inter-venors' tardiness in moving to intervene. They were put on constructive notice, at the latest, on September 7, 1989, when Columbus–America published its Rule C notice in the *Virginian Pilot and Ledger*

---

**10.** As evidenced by the following passage in the district court's opinion, the court clearly was unimpressed with the evidence presented by the insurance companies as to ownership:

> Insurance Companies rely solely upon the newspaper accounts for evidence that they were insurers, the name of the insured, the amount of the insurance, the value of the shipment, whether a claim was made, what sum was supposedly paid, and to whom. They well must rely on the newspaper articles for they have no copies of any insurance policies, invoices for shipments, proof of loss, amounts paid or other records. Without the newspaper accounts, the evidence is totally insufficient to establish any claim of the in-surance companies.

*Columbus–America Discovery Group, Inc. v. Un-identified, Wrecked and Abandoned Sailing Ves-sel*, 742 F.Supp. 1327, 1341 (E.D.Va.1990).

The majority appears to have concluded that since the district court stated that the evidence was "totally insufficient" without the newspaper accounts, the court was implicitly stating that the evidence was sufficient with those accounts. I do not agree with this conclusion. I believe the district court was merely stating that with-out the newspaper accounts there was no evi-dence to support the insurance companies' claims and with the accounts there was some evidence. The court did not find that the insur-ance companies had met their burden of proof in establishing that they had paid claims and therefore had acquired an ownership interest in the cargo.

*Star* stating the coordinates of the area where the CENTRAL AMERICA was found. Moreover, the record reveals that Columbia has been aware of, and indeed a part of, this litigation almost from the first moment that Columbus–America first set foot in court. Less than two months after filing its original in rem complaint on July 17, 1987, Columbus–America sought and obtained a preliminary injunction forbidding other would-be recoverers of the treasure from an area then thought to contain the wreck of the CENTRAL AMERICA. See *Columbus–America Deep Search, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel,* Civil No. 87–363–N (E.D.Va. July 17, 1987); App. 53. Not only was Columbia a party in that proceeding and specifically addressed in the district court's order, it appealed and unsuccessfully sought a stay of the injunction in this court. See order of August 3, 1987 entered in our case no. 87–3606, which appeal was later dismissed by stipulation on December 18, 1987. The fact that the CENTRAL AMERICA later was found within the area established by the injunction of August 1989, see Civil No. 87–363–N (E.D.Va. Aug. 18, 1989), does not later the inescapable fact that, at the latest in July of 1987, Columbia had actual knowledge of Columbus–America's assertion of rights over the very wreck that was the subject of Dr. Ryan's work and of the very lawsuit in which Columbia later sought to intervene on the eve of trial. See 742 F.Supp. 1327, 1334 (E.D.Va.1990); App. 438. Given these facts, it would not have been an abuse of discretion for the district court to have denied the motions for intervention as untimely.

However, rather than deny the motions, as it could have done, the district court conditionally permitted the intervention on the intervenors' willingness to go forward with the trial at its previously scheduled time. Conditions can be imposed on an intervenor even when he intervenes as a matter of right under Rule 24(a). See *Stringfellow v. Concerned Neighbors in Action,* 480 U.S. 370, 383, 107 S.Ct. 1177, 1185, 94 L.Ed.2d 389 (1987) (Brennan, J., concurring) ("restrictions on participation

may also be placed on an intervenor of right"); *United States v. South Florida Water Management Dist.,* 922 F.2d 704, 710 & n. 9 (11th Cir.), cert. denied sub nom. *Western Palm Beach County Farm Bureau, Inc. v. United States,* — U.S. —, 112 S.Ct. 407, 116 L.Ed.2d 356 (1991); *Harris v. Pernsley,* 820 F.2d 592, 599 n. 11 (3d Cir.1987), cert. denied sub nom. *Castille v. Harris,* 484 U.S. 947, 108 S.Ct. 336, 98 L.Ed.2d 363 (1987); *United States v. Hooker Chemicals & Plastic,* 749 F.2d 968, 992–93 n. 22 (2d Cir.1984); *Morgan v. McDonough,* 726 F.2d 11, 14 (1st Cir.1984). The conditions imposed by the district court were not onerous considering the untimeliness of the motions for intervention. In fact, the court even allowed the intervenors to perform limited discovery during trial.

If the intervenors were unhappy with the conditions imposed, they had the option of declining the court's offer. Had they done so, their motion to intervene would have been denied and that denial could have been appealed to this court. The majority's holding thus allows the intervenors two days in court instead of the timehonored one. Because they accepted the court's conditions, they were able to participate in the trial. At trial, they lost. Now the majority's holding will allow them to try their case a second time. I would hold that the district court did not err in conditioning John, Grimm, and Columbia's untimely intervention on their willingness to participate in the trial at its previously scheduled date. The district court, by being overly accommodating to the intervenors, and not requiring them to take the case as they found it, if intervention was granted, as it had every right to do, is now wrongfully found guilty of error, I submit, for its perfectly proper rulings.

The effect of the majority's decision is to allow a prospective intervenor to delay a motion to intervene until the eve of a trial it has known about for months, and then force either a delay in the trial or error. I submit that Rule 24(a) properly admits of no such result.

*Conclusion*

In sum, I would affirm the district court's judgment. I would hold that the district court was not clearly erroneous in finding that the insurance companies had abandoned all claims they may have had to the cargo in the CENTRAL AMERICA and that the district court did not abuse its discretion in placing conditions on granting of the untimely motions to *intervene*.